[L. A. No. 419. In Bank.—June 3, 1899.]

CITY OF LOS ANGELES, Respondent, v. A. E. POMEROY et al., Appellants.

CONDEMNATION OF LAND—SPECIAL PROCEEDING—STATUTORY CONSTRUCTION —JURISDICTION OF SUPERIOR COURT.—The statute providing for the condemnation of land for public use, in a special proceeding in the superior court, should not receive a strict construction against powers of the superior court not expressly conferred; but the superior court is invested with general jurisdiction of all special proceedings, not otherwise provided for, and in conducting such special proceedings exercises its usual and ordinary powers in disposing of the issues necessarily involved, and may exercise implied power to do that which is necessarily incident to the authorized proceeding.

ID.—IMPLIED POWER TO DETERMINE INTEREST OF PLAINTIFF.—In such a proceeding, the superior court may not only determine adverse claims of defendants as to the compensation to be awarded, under the express provisions of the statute, but it may also exercise implied power to determine the fact and extent of the interest of the plaintiff in the land sought to be condemned, where such interest is disputed; and such interest need not be first determined in an independent action to quiet the plaintiff's title.

ID.—CONDEMNING HEADWORKS FOR WATER SYSTEM—RIGHT OF CITY TO FLOW OF WATER.—In an action by the city of Los Angeles to condemn land for headworks for its projected system of supplying water to its inhabitants, for private and municipal purposes, the right of the city to the flow of water through the land sought to be condemned may be litigated and determined.

ID.—PENDING ACTIONS—STAY OF PROCEEDINGS—STRIKING OUT CLAIM OF CITY.—In such action, motions of the defendants to stay proceedings until the determination of other pending suits between the city and the defendants, in which the questions as to their respective rights in the waters in controversy were involved, and to strike out the claim of the city to such waters in the proceeding for condemnation, are properly denied.

ID.—DESCRIPTION OF PROPERTY TAKEN—EXCLUSION OF RIVER AND RIPARIAN RIGHTS.—The description of the property sought to be condemned, as being all of the estate and interest of the defendants in a tract of land described, which interest is alleged to be a fee-simple estate, subject to the paramount and exclusive right of the city to the use of all of the waters of the Los Angeles river, from its source, flowing through said lands, to the southern boundary of the city, exclusive of all riparian rights in the owners of the lands, sets forth with sufficient certainty the claim of the city, and the interest sought to be condemned.

ID.—QUESTION AS TO CITY'S CLAIM—DEMURRER.—The only question to be considered upon demurrer to the complaint of the city, as respects its claim to the waters of the river, is whether it has been clearly stated. The question whether, in fact, the city has any such legal right, or can establish it, in fact and in law, is not matter to be considered in ruling upon the demurrer.

ID.—STIPULATION AS TO TRIAL—FINDINGS—SUBMISSION OF DAMAGES TO JURY. — INSTRUCTIONS. — Under stipulation that the issues were to be tried by the court, except only the question of damages, which was to be submitted to a jury, it is not necessary that the court should first formally prepare and file its findings and conclusions of law as to the rights of the parties submitted to it for its determination, before submitting the damages to the jury; but it is sufficient to inform the jury as to its conclusions, and to instruct them fully and correctly as to the respective rights of the parties, and as to the quantity and extent of the estate and interest of the defendants in the land, in order that they may correctly estimate its value.

ID.—RIGHT TO TAKE FEE SIMPLE—USE OF LAND FOR RESERVOIR.—Where the land to be condemned "for the purpose of constructing head-works for a water system" is so saturated with water to within a few feet of the surface as to be a natural reservoir, and it was proposed to construct a subsurface dam at the lower end of the tract, and to construct a tunnel and lateral galleries to drain the water, and conduct it to supply pipes, thus making the land better subserve the purpose of a reservoir, the fee simple of the land may be taken for such use.

ID.—NECESSITY FOR TAKING ENTIRE TRACT.—Where the evidence was conflicting as to the necessity of taking the entire tract described in the complaint, and the evidence for the plaintiff showed that, in view of the rapid increase of the population of the city, it would probably be necessary to increase the supply of water by extending additional galleries from other parts of the tract, and that it was necessary to exclude stock from the entire tract to prevent contamination of water, the finding of the court as to the necessity of taking the whole tract cannot be disturbed.

ID.—PERCOLATING WATER—SUBTERRANEAN FLOW OF RIVER—VALUE OF LAND.—Percolating water which forms part of the subterranean flow of the Los Angeles river, and which is moving in the same direction with it, through the lands sought to be condemned, does not belong to the owner of the soil, and cannot be taken and conveyed away by him to other lands for sale; and where the supply of percolating water which might be so removed is of slight value, and might be wholly interfered with by drainage on adjoining lands, a verdict fixing the value of the land at its market value for agricultural purposes will not be disturbed upon appeal.

ID.—PERCOLATION NOT INCONSISTENT WITH STREAM—DEFINED CHANNEL.— The fact of percolation is not inconsistent with the idea of a stream, when it is caused by the waters of a subterranean stream passing through the voids of loose, permeable material filling or partially obstructing the channel of the stream, and when the material through which the water forces itself fills a well-defined channel, with impervious sides and bed.

ID.—DIVERSION OF UNDERFLOW OR PERCOLATING WATER.—The owners of the soil cannot divert any part of the underflow of subterranean water forming part of the stream, whether such water would or would not reach the surface stream of the river; nor can he divert percolating water if the effect would be to cause the water of the stream to leave its bed to fill the void caused by such diversion.

ID.—NATURE OF SUBTERRANEAN STREAM — QUESTION OF LAW—INSTRUC-TIONS—PROVINCE OF JURY.—What a subterranean stream must be in order to bring it within the law of riparian rights, is a question of law; and instructions which are applicable to the evidence, and the entire scope of which includes nothing but a statement of the facts which the jury must find from the evidence, in order

to determine whether there is a subterranean stream, and, if so, how much of the water in the land is part of the stream, do not usurp the province of its jury, or charge them upon questions of fact.

ID.—RULES OF SURFACE STREAMS APPLICABLE. — Subterranean streams flowing through known and definite channels are governed by the same rules that apply to surface streams.

ID.—"DEFINED" AND "KNOWN" CHANNEL—REASONABLE INFERENCE.— The channel of a subterranean stream is "defined" when it is contracted and bounded, though the course of the stream may be undefined to human knowledge; and its course is sufficiently "known" when it is the subject of reasonable inference.

ID.—INFERENCE AS TO CHANNEL—SUBMISSION TO JURY.—Where the boundaries of the channel and the existence and course of a subterranean stream in the lands sought to be condemned are not defined or known, otherwise than by inference from the evidence, and it might reasonably be inferred therefrom that the channel was bounded and defined by the sloping sides of hills meeting underground, and that there was a subsurface flow in that channel through such lands, corresponding with the known surface flow of the river outward through the gap, the court was justified in submitting to the jury whether the subsurface flow in such lands was a part of the stream.

ID.—RIGHTS OF CITY AS SUCCESSOR OF PUEBLO—INSTRUCTIONS—INEFFECTIVENESS OF STATUTE—PROVINCE OF JURY.—The instructions given as to the rights of the city of Los Angeles as the successor of the pueblo, necessarily controlled the verdict of the jury as to those rights; and a request for a counter-instruction, submitting to the jury the ineffectiveness of an act of the legislature upon the rights of the defendants as claimants under Spanish and Mexican grants, is not matter within the province of the jury, and is properly refused.

ID.—EXTENT OF PARAMOUNT RIGHTS OF CITY—RIPARIAN RIGHTS OF MEXICAN GRANTEES.—The paramount rights of the city of Los Angeles in the waters of the Los Angeles river over the riparian rights of persons claiming under Spanish and Mexican grants are not limited to water sufficient to supply the original pueblo, to which the city was a successor; but the extension of its limits by increase of the population must be deemed within the purview of the original grant of those waters to the pueblo, and the effect of the grant must be deemed the same as if the waters had been condemned for public use, and all possibilities of the future growth and requirements of the city were taken into consideration.

ID.—OUTFALL SEWER.—The water having been granted or dedicated for the health and convenience of the pueblo, as well as for other purposes, the right to drain the city by means of an outfall sewer, and to keep it in a state of efficiency by the necessary flushing, is within the pueblo right.

ID.—PONDS AND ARTIFICIAL LAKES—DISCRETION OF CITY.—The needs of the city may extend to the use of water for ponds and artificial lakes; and the discretion of the municipal authorities in such use will not be interfered with where no gross abuse of such discretion is manifest.

ID.—SUSPENSION OF AYUNTAMIENTO.—The suspension of the ayuntamiento of Los Angeles under the Mexican law of 1837, and the temporary administration of its affairs by a prefect, did not affect the paramount rights of the pueblo to the use of the waters of the Los Angeles river.

ID.—MARKET VALUE OF PROPERTY AT DATE OF SUMMONS—CONSTRUCTION OF CODE—"ACTUAL VALUE"—SUBSEQUENT DISCOVERIES.—Under section 1249 of the Code of Civil Procedure, which makes the right to the property sought to be condemned accrue at the date of the summons, and provides that "its actual value, at that date, shall be the measure of compensation," the market or exchange value of the property at the date of the summons is the only criterion of its "actual value" at that date, and "actual value" means actual market value. Subsequent discoveries as to the intrinsic value of the land cannot be considered for the purpose of showing that its actual value at the date of the summons was greater than its market value.

ID.—AUTHORITY FOR PROCEEDING—DIRECTION OF CITY COUNCIL—SUBSEQUENT PUBLICATION OF ORDINANCE—RATIFICATION.—Where the city council, by resolution, directed the city attorney to commence the proceeding for condemnation as soon as the ordinance authorizing it was signed by the mayor, the subsequent publication of the ordinance as required is at least a ratification of the act of the officer in obeying the directions given, in anticipation of such publication.

ID.—PLAN OF HEADWORKS—ADOPTION OF ENGINEER'S REPORT—SUBSEQUENT ADOPTION OF DETAILED PLAN.—It appearing that, prior to the commencement of the proceeding for condemnation, the city adopted an engineer's report recommending, in general outline and in all essentials, the plan for the headworks of its water system, for which the condemnation of lands was sought, the adoption, after its commencement, of a detailed plan, followed by other orders and resolutions providing the means for carrying it out, and complying with the terms of the judgment sought, cannot sustain the technical objection that the action was commenced without authority, in pursuance of a plan not formally adopted.

COSTS—TRANSCRIPT OF REPORTER'S NOTES—AGREEMENT OF PARTIES.—The taxation of the transcript of the notes of the official reporter as costs of the successful party is regulated by section 276 of the Code of Civil Procedure as it stood prior to the invalid amendment of 1885; and where the transcript was not ordered by the court, but furnished to the parties at an agreed rate of compensation, it cannot be taxed as costs, and an item therefor is properly stricken from the bill of costs.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Lucien Shaw, Judge.

The facts are stated in the opinion of the court.

R. H. F. Variel, John G. North, and J. S. Chapman, for Appellants.

. Proceedings for the condemnation of land are *in invitum,* and the statute providing for them must be strictly construed and strictly pursued. (*San Francisco etc. Water Co. v. Alameda Water Co.,* 36 Cal. 639; *Southern Pac. R. R. Co. v. Wilson,* 49 Cal. 396, 398; *Damrell v. Board of Supervisors,* 40 Cal. 154, 158; *Ventura County v. Thompson,* 51 Cal. 577; *Lindsay Irr. Co. v. Mehrtens,* 97 Cal. 676; *Gilmer v. Lime Point,* 19 Cal. 47.) The plaintiff cannot aver title in himself in such proceedings. (*San Jose v. Freyschlag,* 56 Cal. 8; *Colorado etc. Ry. Co. v. Croman,* 27 Pac. Rep. 256; Mills on Eminent Domain, sec. 161.) The proceeding cannot be converted into an action to quiet title. (*Alviso Water Co. v. Baker,* 95 Cal. 268.) There must be an accurate description of the property sought to be condemned. (*Alviso Water Co. v. Baker, supra.*) The city is not the owner of the *corpus* of the water of the Los Angeles river. (*Los Angeles v. Baldwin,* 53 Cal. 469; *Vernon Irr. Co. v. Los Angeles,* 106 Cal. 250-53.) The three hundred and fourteen acres of land could not be condemned in fee simple, since an easement for water is the thing· sought. (Code Civ. Proc., sec. 1239, subds. 1, 2.) There is no provision in the law for honeycombing the land with tunnels and filtration galleries. The filtrating or percolating water belongs to the owner of the soil. (27 Am. & Eng. Ency. of Law, 424-26; *Hanson v. McCue,* 42 Cal. 303; *Cross v. Kitts,* 69 Cal. 217; 52 Am. Rep. 558, 561, 562; *Painter v. Pasadena etc. Co.,* 91 Cal. 74, 81-83; *Southern Pac. R. R. Co. v. Dufour,* 95 Cal. 615; *Hale v. McLea,* 53 Cal. 578; *Gould v. Eaton,* 111 Cal. 639, 644; *Wheatley v. Baugh,* 25 Pa. St. 528; 64 Am. Dec. 721; *Haldeman v. Bruckhart,* 45 Pa. St. 514; 84 Am. Dec. 511; *Lyle's Appeal,* 106 Pa. St. 626; 51 Am. Rep. 542.) The water rights of plaintiffs as successors of patents to Mexican grantees cannot be affected or changed by the legisla-

ture. (*Vernon Irr. Co. v. Los Angeles, supra; Moore v. Stein-bach*, 127 U. S. 70; *Mosier v. Caldwell*, 7 Nev. 363; *Barnes v. Sabron*, 10 Nev. 217; *Wagner v. Long Island R. R. Co.*, 2 Hun, 633; *Chase v. Silverstone*, 62 Me. 175; 16 Am. Rep. 417; *Taylor v. Welch*, 6 Or. 198.)

W. E. Dunn, and Lee & Scott, for Respondent.

The proceedings were in a court of general jurisdiction, and title could be determined by it in accordance with its general powers without prior resort to a proceeding to quiet title. (Code Civ. Proc., secs. 759, 1247; *Bollo v. Navarro*, 33 Cal. 467; *Morenhout v. Higuera*, 32 Cal. 298 ) It may be shown upon proper pleadings that the estate of the defendant is less than the full legal and equitable interest in the land. (*Colorado etc. Ry. Co. v. Allen*, 13 Colo. 229; Mills on Eminent Domain, sec. 160.) The defendants could not divert any subterranean waters forming part of a running stream to lands not riparian. (*Heilbron v. Land etc. Co.*, 80 Cal. 189; *Vernon Irr. Co. v. Los Angeles*, 106 Cal. 256; *Gould v. Eaton*, 14 Cal. Dec. 25.) A right of way or easement not being sufficient for the purposes of the city, it could take the fee simple (Code Civ. Proc., sec. 1239, subd. 1), and it could determine what property was needed for the use for which it was to be put, the cost of the property being sufficient to deter the municipality from the useless acquisition of land. (Mills on Eminent Domain, sec. 62; *Los Angeles v. Waldron*, 65 Cal. 213; *Pasadena v. Stimson*, 91 Cal. 253; *Lynch v. Forbes*, 161 Mass. 302.) The market value of the property at the date of the summons must control, and no subsequent circumstances can be considered. (Code Civ. Proc., sec. 249; *San Diego etc. Co. v. Neale*, 78 Cal. 68; *S. & C. R. Co. v. Galgiani*, 49 Cal. 140; *Spring Valley W. W. v. Drinkhouse*, 92 Cal. 528; *Los Angeles etc. Ry. Co. v. Rumpp*, 104 Cal. 20; *Searle v. L. R. R.*, 33 Pa. St. 57; Mills on Eminent Domain, sec. 168.) The boundaries of an underground stream need not be well defined, and it may ooze or percolate through loose material. (*Emporia v. Soden*, 25 Kan. 588; *McClellan v. Hurdle*, 3 Colo. App. 430; *Hale v. McRea*, 53 Cal. 583; *Keeney v. Carillo*, 2 N. Mex. 480, 495; *Strait v. Brown*, 16 Nev. 317.) Its existence and boundaries may be a matter of reasonable inference. (Kinney on Irrigation, secs.

44, 48, 49; 27 Am. & Eng. Ency. of Law, 423, 424.)   The instructions given were properly given, and those refused were properly refused.   The Mexican grants were made long after the foundation of the pueblo, and were subject to the rights of the city to the waters of the river.   The rights of the pueblo were properly devolved upon the city.   (*Vernon Irr. Co. v. Los Angeles, supra; Lux v. Haggin,* 69 Cal. 320; *Hart v. Burnett,* 15 Cal. 530.)   The ordinance was in effect before the summons was issued, and therefore before this proceeding was commenced in contemplation of law.   (*Pacific Ry. Co. v. Porter,* 74 Cal. 26.) The authority of the city attorney is presumed, and was properly ratified.   (*Pasadena v. Stimson, supra.*)

BEATTY, C. J.—This is a proceeding to condemn "all the estate, right, title, and interest" of the defendants in and to a tract of land embracing about three hundred and fifteen acres, for the purpose of enabling the plaintiff—a municipal corporation—to construct and maintain thereon the "headworks" of its projected system for supplying water to its inhabitants for private and municipal purposes.  The defendants, appealing from a decree of condemnation and from an order overruling their motion for a new trial, not only allege numerous errors in the rulings of the superior court, but challenge the correctness of its findings of fact in many important particulars.   With respect to these disputed facts it will be necessary to state the various contentions of the parties in discussing the particular legal questions to which they give rise, and, passing them over for the present, we will, in this connection, only attempt to set forth the more general aspect of the case, as to which there is no substantial disagreement.

The city of Los Angeles, at the date of the commencement of this action, June 8, 1893, contained a population of about seventy thousand souls and covered an area of about twenty thousand acres.   At the date of the trial, in March, 1896, the population was upward of seventy-five thousand, having increased to that number from less than twelve thousand in 1880.   This rapid growth of the city promises to continue, and the only source of water supply for its inhabitants and for municipal purposes is the Los Angeles river, which flows through the city from north to south.   The principal source of the river above the city

is the San Fernando valley.   This valley, embracing a watershed
of from four hundred and fifty to four hundred and ninety
square miles, is almost completely inclosed by considerable
ranges of mountains, rising in places to an elevation of over six
thousand feet.   The most important of these ranges is the San
Fernando, which bounds the interior valley on the north.   On
the south and west it is bounded by the Cahuenga range, which
at its northwestern extremity unites with the San Fernando.
On the east the Verdugo hills are connected with the San Fer-
nando range on the north, and, extending toward the south,
leave a comparatively narrow outlet to the valley between their
southern extremity and the eastern prolongation of the Ca-
huenga range.   Through this outlet at the southeastern corner
of the interior basin the Los Angeles river issues, flowing in
an eastern direction parallel and close to the northern base of
the Cahuenga range, until, having passed that obstruction, it
turns to the south and flows through the city to the Pacific
ocean.   The interior of the San Fernando valley is a plain com-
posed of *detritus* washed from the mountain sides, and having
a moderate slope from the San Fernando range on the north
toward the Cahuenga range in the south, and from the west
toward the east.   This portion of the valley—that is to say, the
portion composed of material not in place, *detritus* washed from
the mountain side—which, for convenience, may be called the
valley proper, extends about twenty-four miles from east to
west, and is about twelve miles wide at its widest part, embrac-
ing an area of about one hundred and eighty square miles.   Its
material is composed of bowlders, gravel, sand, and occasional
masses of clay.   The rainfall within the watershed of the val-
ley is variable.   When it is abundant, and the loose, porous ma-
terial composing the valley proper is thoroughly saturated, the
streams issuing from the rocky canyons of the mountains flow
over the surface to the outlet of the valley and pass off as
flood waters down the channel of the Los Angeles river.   But
this surface flow does not continue for any great length of time,
and, under ordinary conditions, the mountain streams sink in
the sand within a short distance of the mouths of the canyons,
and no water appears upon the surface until it shows itself again
in the Los Angeles river, where it takes its rise a short distance

north of the Cahuenga range on the southern side of the valley proper.

The land which the city seeks to condemn lies at the base of the Cahuenga range, in the narrow outlet of the valley. It is almost two miles in length from east to west, and averages a quarter of a mile in width. At its eastern end it is about a mile west of the point where the Verdugo hills make their closest approach to the Cahuenga range—the width of the valley proper at this point being about two miles. Where the land lies the width is from two and a half to three miles. The surface of the river where it flows out of the land in question at its eastern end has an elevation above the sea level of about four hundred and sixty feet, and is two hundred feet higher than the main portion of the city of Los Angeles. In ordinary seasons, after the flood waters have run off and the river has assumed its normal condition, the water rises to the surface at some distance west of the land sought to be condemned, and increases rapidly in volume as it flows toward the east. There is considerable difference between the estimates of different witnesses, but it may be said in general terms in this connection, where strict accuracy is not important, that the surface flow of the river, where it enters the tract in question, is about twelve hundred inches, miners' measure, and that its volume is about doubled by the accessions it receives in passing through the tract. These accessions are of the character that would naturally be expected from the topography of the valley and the nature of the soil under and adjacent to the surface stream. The whole country on either side of the stream is found to be completely saturated with water—the plane of saturation near the open channel being slightly higher than the surface of the river, and gradually rising in proportion to the distance from the stream. From the sides and bottom of the visible stream the water percolates, or trickles, or gushes, according to the nature of the soil, whether fine and comparatively compact, or coarse and gravelly and more loose and porous.

The plan of the city for utilizing the land which it seeks to condemn is to drive a tunnel through it from east to west, a few feet below the bed of the river, and to extend filtration galleries north and south from the tunnel in such number and at

such places as may be found best adapted to securing an ample supply of water. The plan also embraces a submerged dam and collecting chambers or reservoirs, but the main feature is the tunnel with its lateral galleries, from which ᵒ the water, draining and filtering out of the saturated soil, is to be delivered to the main supply pipe of the city, and thence to its distributing system.

The principal points of controversy between the parties are: 1. As to the existence of a well-defined subterranean stream by which the waters, or a large portion of the waters, resulting from the rainfall within the watershed of the San Fernando valley, are carried off through the pass between the Cahuenga range and the Verdugo hills; and 2. As to the rights of the city of Los Angeles, as successor to the Mexican pueblo, in the waters of the Los Angeles river.

The claim of the plaintiff is, that the city has certain extensive rights in the stream over and above those of ordinary riparian owners, and that the stream itself consists not only of the visible surface flow of the river, but of the large subterranean flow slowly passing through the bowlders, gravel, and sand under and adjacent to the river.

Both of these claims are disputed by the defendants, and out of this controversy arise most of the points to be considered in disposing of the appeal. As to the rights of the city as successor to the pueblo, the allegation of the amended complaint is, that ever since its organization the city has been the owner in fee simple of the exclusive right to the use of all the waters of said river, from its source to the southern boundary of the city, in trust for the public purposes of supplying the inhabitants of said city with water for domestic uses, and of supplying water for the irrigation of the irrigable lands embraced in the four square leagues of the pueblo, and for other municipal uses. And it is alleged that the defendants own the land sought to be condemned, subject to this right of the city to the waters of the stream. These allegations are denied by the defendants, and, in view of the issue thus made, the defendants, before the commencement of the trial, moved the court to stay the proceedings in the action until the determination of certain other suits then pending between the city and the defendants, in

which the question as to their respective rights in the waters of the river was involved. The defendants also moved to strike out the allegations of the complaint setting up the claim of the city to the waters of the stream, contending that the city could not maintain a proceeding to condemn lands while asserting title in itself to that which constituted their chief value. These motions were denied by the superior court, and the exceptions to the rulings thereon give rise to the first point discussed in the briefs. Before taking up this point, however, it may be well to state the manner in which, by consent of the parties, the case was tried. It was stipulated that the court, sitting without a jury, should hear the evidence of the parties for the purpose of determining: 1. Whether the use to which the property was to be applied was one authorized by law and the taking necessary; 2. Whether the proposed plan was compatible with the greatest public good and least private injury; and 3. What was the nature and extent of the plaintiff's interest in the waters of the river. And these things being determined, that a jury should be impaneled to assess the amount of compensation to be awarded to the defendants for the interest condemned. In accordance with this stipulation the court heard evidence bearing upon the three points mentioned, and at its close called a jury, before whom the trial proceeded upon the question of damages. During the progress of the jury trial the court made an oral announcement of its conclusions upon the issues submitted to its decision, but no formal findings were filed until after the jury rendered their verdict. The court, however, in charging the jury instructed them as to those matters so far as it deemed such instructions necessary.

The consent of defendants to this mode of trying the various issues in the case was, however, given with an express reservation of their objection that the court had no jurisdiction in this proceeding to try any question of title in the plaintiff to the waters of the river, and they now contend that the superior court erred in refusing to stay the trial of the cause until the respective rights of the parties had been determined in other pending suits; and this upon the ground that a proceeding for condemnation is not one in which adverse claims of title can be adjudicated.

This contention is rested upon the proposition that the proceeding, being statutory and special, must be strictly pursued, and, since the statute makes no express provision for litigating a claim by the plaintiff to an interest in the property sought to be condemned, the court has no power to determine such claim, at least when contested by the defendant.   But we think the statute does not require so strict a construction.   The superior court is invested with a general jurisdiction of all special proceedings not otherwise provided for; and in conducting such special proceedings exercises its usual and ordinary powers in disposing of the issues which are necessarily involved.   Among the matters which may be involved in any proceeding to condemn private property for a public use are adverse claims to the compensation to be awarded.   In such proceedings the complaint must contain the names of all owners and claimants of the property, if known (Code Civ. Proc., sec. 1244), and all persons claiming any interest in the property, or damages, though not named, may appear and defend.   (Code Civ. Proc., sec. 1246.)   And the court has power "to hear and determine all adverse and conflicting claims to the property sought to be condemned, and to the damages therefor."   (Code Civ. Proc., sec. 1247.)

These propositions are, of course, conceded by the appellants, but they contend that the right to set up and litigate adverse claims is confined by the very words of the statute to those who are defendants.   It is true the express provision above quoted from (Code Civ. Proc., sec. 1247) applies only to the conflicting claims of those who are made, or who make themselves, defendants in the proceeding, but this is only because the interests of the defendants alone are to be condemned.   The statute does not contemplate the condemnation of an interest which the plaintiff already has, or the payment of any damages except to compensate those whose property is to be taken away; and, therefore, the plaintiff can have no concern in the determination of "adverse or conflicting claims to the property sought to be condemned and the damages therefor."   But, although this provision of the statute has no direct bearing on the question here presented, it contains an express legislative recognition of the

entire competency of the court to try and determine adverse claims to the property in a proceeding to condemn.

The question, however, which we have to decide is this: Can a plaintiff who is already the owner of an interest in land secure the condemnation of outstanding interests in a case which in other respects is a proper one for condemnation?

This is an important question, for it is apparent that such cases may frequently arise. Private property suitable and necessary for some lawful public use is often owned in shares by different persons, or subject to liens or servitudes, and the owner of a share, or an easement, or holder of a lien, may be the proper agent of the state for the exercise of its power of eminent domain. In such case, it is certainly desirable that the law should supply a convenient procedure by which he could secure exclusive control and ownership of the property upon payment of the value of the outstanding shares, or of the whole, less the amount secured by lien, or as diminished by the existing servitudes. The defendants do not seem to contest the proposition that our statute is adequate to the exigencies of such a case, but they contend that, when the interest asserted by the plaintiff is disputed, the proceeding to condemn must be held in suspense until, in a separate action, the respective interests of the parties are judicially determined. But why the necessity of such circuity of action? Both branches of the controversy would in any event be tried and determined in the same forum, and there seems to be no good reason why they may not be litigated in one action. Even if the adverse claim of the plaintiff were first determined in an action to quiet title, its subsequent assertion in a proceeding to condemn—whether admitted or contested—would be just as foreign to any express provision of the statute as if his right had never been determined. It follows, therefore, that the argument that the court can do nothing in these proceedings, except that which is in terms authorized by the statute, proves too much. It would not only debar the plaintiff from proceeding before his title had been adjudicated, but would debar him always.

We see no reason for holding that a plaintiff is debarred from proceeding in such a case, nor can we see that the trial of all the issues in one action is attended with any special incon-

venience.   In whatever mode the plaintiff's interest in the prop-
erty might be determined—whether in a separate action, or
preliminarily in the proceeding to condemn, as was done in this
case—the same consequences would follow; that is to say, the
jury called to try the question of damages would require in-
structions as to the nature and quantity of outstanding inter-
est remaining in the defendants, upon which to base an esti-
mate of the damages, and the defendant would have the same
remedy in case of erroneous instructions in either case.   Con-
siderations of convenience, therefore, do not seem to sustain
the contention of appellant on this point.   On the contrary, it
would seem that very great public inconvenience might ensue
if a plaintiff, asserting an interest in property which he seeks
to subject to a public use, were obliged in every instance to
prosecute to final judgment an action to quiet his title before
he could proceed to condemn.   And if he can commence the
proceeding to condemn before his interest has been adjudicated,
it does not seem that a denial of his interest should stop the
proceeding, for it is in the same court in which that issue must
be tried in any event, and to try it when it is first made is only
to do that which is necessarily incident to a proceeding clearly
authorized, and express authority to do anything always implies
the power to do that which is necessarily incidental.

If the views above expressed are in themselves reasonable, and
if they embody a proper construction of the statute, they ought
to prevail, even if opposed to previous decisions of this court;
for no vested right can be violated or impaired by freeing a statu-
tory remedy from inconvenient and burdensome restrictions
imposed by a mistaken construction of the law.   We are satis-
fied, however, that there is nothing decided in any of the cases
referred to by counsel for appellants which is at all inconsistent
with our conclusions.   In *Sacramento Valley R. R. Co. v. Mof-
fatt*, 7 Cal. 577, it was held, construing an act of 1853, that the
commissioners appointed to assess the value of the property had
nothing to do with the settlement of adverse claims, and that
the persons in possession of the land condemned for a railroad
were entitled to the whole assessed value of the land, as against
third parties out of possession but claiming a superior title.
This may have been a correct construction of the act of 1853,

but the question here is different, and the law is materially different. In *Spring Valley Water Works v. San Francisco,* 22 Cal. 434, the act of 1853 was again construed, and it was again held that the commissioners appointed under that act to assess the value of the property condemned had nothing to do with adverse claims of ownership. That is a matter, it was said, to be determined by the court or judge before whom the proceeding was conducted, thus implying at least that the court could do what in the former case it was held it could not do. *Wilcox v. Oakland,* 49 Cal. 29, contains a *dictum* in line with the decisions in the two cases last cited, to the effect that the commissioners appointed to assess damages have no authority to try questions of title as between adverse claimants—a proposition having no relation to the point in dispute here. In *San Jose v. Freyschlag,* 56 Cal. 8, which was a proceeding to condemn land for a street, the complaint alleged that the defendants were in possession and were the only owners and claimants of the land, and the answer set up the same fact. The jury, however, while assessing the damages at three hundred dollars, added a finding that defendants had dedicated the land for a street, and the court, adopting this finding, condemned the land, and awarded the defendants one dime by way of compensation. This judgment was reversed upon the sole and obvious ground that it was in conflict with the pleadings and based upon a finding without the issues, the court remarking *obiter* that if the plaintiff had alleged the fact of dedication it would have alleged itself out of court, because it would thus have shown the existence, by virtue of the dedication, of the only right it could have acquired by the proceeding to condemn.

*San Jose v. Reed,* 65 Cal. 242, was in all material respects the same as *San Jose v. Freyschlag, supra,* and was decided the same way. The correctness of these decisions, and of the *dictum,* added to the first must be conceded, but they are not in point. The pleadings in this case distinctly allege that the defendants have a certain interest in the lands to be condemned, but not the whole interest; they show, in other words, that there is something to be condemned, and what that something is, and clearly make the issue which the court is to try. *San Francisco etc. Water Co. v. Alameda Water Co.,* 36 Cal. 639, was a suit by

one water company to enjoin a rival corporation from carrying on a proceeding to condemn water rights as to which the plaintiff asserted a preferential right of condemnation. It was held that the action was well brought in the district court, because the existing statute had not empowered the county court to try the question of preferential right between two corporations seeking to condemn the same property. This was no doubt a correct construction of the act of 1858, but our present statute is different (Code Civ. Proc., sec. 1247), and if the question were the same it would require to be differently decided, but it is in fact a very different question. In *Aliso Water Co. v. Baker,* 95 Cal. 269, it was held upon special demurrer that the complaint was bad for uncertainty in the description of the interest sought to be condemned. The plaintiffs, in that case, endeavored to excuse the admitted uncertainty in the description of the water rights which they sought to condemn, upon the ground that they could not know the extent of such rights, and that it was, therefore, the duty of defendants to set out a certain description of what they claimed. Replying to this contention the writer of the opinion said that it necessarily implied the further contention that the defendants would be subsequently estopped from asserting any rights which they neglected to set out—a contention which he held could not be allowed, because this proceeding (to condemn) cannot thus be converted into an action to quiet title. This single expression in the opinion is all that appears to have any bearing upon the question here, and its bearing is only apparent, for, considered with reference to the point to be decided and in connection with what precedes and follows, it evidently means nothing more than this: that the plaintiff cannot, in the proceeding to condemn, as he can in an action to quiet title, throw upon the defendant the burden of pleading the particular rights to be litigated, under penalty of forfeiting all that he does not expressly claim; or, in other words, that the rule of pleading in these cases requires the plaintiff to set out an accurate and intelligible description of the property, or the particular interest in the property which, even in case of default, must be valued before it is condemned. We are in entire accord with this doctrine, and we think the plaintiff here has fully satisfied its demands. It has given an ac-

curate description of what it seeks to condemn, and ought to pay for, before it takes possession. It claims an interest in the property, or an easement which it says diminishes the estate and interest of defendants, and all this is set out in order that the court and jury may know precisely what is to be considered in estimating the damages. We cannot, in the time at our disposal, undertake to review the numerous citations from the text-writers and the decisions of other courts to which we have been referred by counsel. They undoubtedly contain expressions which in some instances are in conflict with the views above expressed, but we find nothing fairly and fully decided which cannot be reconciled with the conclusion we have reached, that the superior court did not err in overruling the motions to stay the proceedings and strike out.

2. The appellants contend, in the next place, that the superior court erred in overruling their several demurrers to the complaint as amended. The ground of the demurrers upon which they insist in their argument here is that the last amended complaint contains no certain description of the property which the plaintiff seeks to condemn, and they cite the case of *Aliso Water Co. v. Baker, supra,* in support of this contention. We do not think the cases are at all parallel. In the Aliso case the description was in the last degree vague and uncertain, but here the complaint shows that the object of the proceeding is to condemn all the estate and interest of the defendants in three hundred and fifteen acres of land, which interest is alleged to be a fee-simple estate, subject only to the asserted ownership by the city of the exclusive right to the use of all the waters of the river from its source to the southern boundary of the city in trust, et cetera. If the interest claimed by the city is set forth with reasonable certainty, it necessarily follows that the interest to be condemned is equally certain, and we see no difficulty in determining from the complaint what the city claims. It asserts a right to the use of all the waters of the Los Angeles river flowing through these lands paramount to and exclusive of any and all riparian rights in the owners of the lands. A great part of the argument of counsel for appellants is devoted to the question whether, in fact and in law, the city has any such right as she asserts, but this part of the argument seems to be out of

place in considering the sufficiency of the complaint.  The fact that the claim of the city has not been, or cannot be, established does not prove that it has not been clearly stated, and that is the only matter to be considered in ruling upon the demurrer.

3.  The next proposition of appellants is stated in these terms: "If the court had any power to determine these questions at all in this action, it was error not to determine those issues before submitting the cause to the jury."  To speak of submitting this cause to the jury is an inaccuracy which tends to confusion.  By agreement of the parties only one issue in the cause was submitted to the jury, viz., the question of damages.  All other issues were tried by the court, and it was of no importance in what order they were decided, except in so far as a determination of one point was necesasry as a basis for the determination of another.  Undoubtedly, it was necessary that the jury should be correctly instructed as to the quantity and extent of the estate and interest of the defendants in the land in order that they might correctly estimate its value, and since, from the nature of the rights in controversy and the agreement of the parties, that point was to be decided by the court, it was necessary that the jury should be informed before retiring to consider of their verdict what the conclusion of the court was, but that conclusion could be stated as well before as after the filing of formal findings of fact and conclusions of law.  These were an essential preliminary to the judgment but not to the instructions to the jury, and, if the instructions actually given were correct and full, the fact that findings had not been previously filed is of no consequence.  Whether the conclusions of the court upon this point were sound and whether the jury were correctly instructed are points to be considered in another connection.

4.  The next contention of appellants is, that there is no authority in law for the condemnation of these three hundred and fifteen acres in fee simple for the purposes for which the property is sought to be condemned.

An ordinance of the city of Los Angeles, approved on the eighth day of June, 1893, is attached to and made a part of the complaint.  By its first section it ordained that it was necessary that the land in controversy "be acquired by condemnation for the purposes of constructing headworks for a water system."  It

will be seen that the purpose to which the land was to be devoted was not very definitely stated in the ordinance, but the amended complaint filed herein is somewhat more explicit and shows with reasonable clearness what the plan of the city is. The land is found to be saturated with water to within a few feet of the surface. It is proposed to construct a subsurface dam at the lower end of the tract. A subsurface dam, of course, would not have the effect of flooding the surface permanently, but it would permanently raise the plane of saturation. This being done, it is next proposed to tap this heavily saturated bed of sand and gravel by means of a tunnel connected with lateral galleries through which the water will be drained off and conducted to the supply pipes. In other words, the land is to be used as a reservoir, such as essentially it is, and none the less so because the water does not rise and stand above the surface. The evidence in the case shows that from one-fifth to one-third of the entire bulk of the material filling the valley below the plane of saturation is water. The land in its natural state, therefore, is a reservoir, and a subsurface dam is to be constructed in order to make it better serve the purposes of a reservoir. Such being the use to which it is to be devoted, the fee simple may be taken. (Code Civ. Proc., sec. 1239; Stats. 1891, p. 102.)

As to the necessity of taking the whole three hundred and fifteen acres the evidence is conflicting, and the finding of the superior court cannot be disturbed. The evidence introduced by the plaintiff showed that, in view of the rapid increase of the population of the city, the probable necessity of extending additional lateral galleries to obtain a larger flow of water, and to conform to changes in the channel of the surface stream, and the necessity of excluding livestock from the land to prevent contamination of the water, it was necessary that the city should have the exclusive ownership and control of the whole tract.

5. Appellants next contend that the amount awarded by the jury as compensation for the tract condemned was not justified by the evidence. The jury found that the value of the defendants' interest in the three hundred and fifteen acre tract was twenty-three thousand dollars, and that their remaining land would be damaged two thousand dollars by the severance of the

smaller parcel.   Appellants concede that the evidence sustains this verdict if the value of the land for agricultural purposes is alone to be considered, but they claim that it is of enormously greater value by reason of the great quantity of water percolating in the soil, which, they contend, they have a right to collect and convey away to other lands for sale.

This claim of ownership of percolating waters is met by a claim on the part of the plaintiff that what the defendants call percolating waters are as truly a part of the Los Angeles river as the visible surface stream, and out of this contention arise the most important questions in the case.

There seems to be no substantial conflict in the evidence and no radical difference between the parties as to the character of the subsurface flow in the tract condemned.  It is agreed that all the waters of the San Fernando valley, except what is lost by evaporation or consumed in plant life, flow out through the narrow pass between the eastern extremity of the Cahuenga range and the Verdugo hills, either on or beneath the surface, and there is abundant testimony to warrant the conclusion that at ordinary stages of the river the water flowing on the surface and that which is beneath the surface are in intimate contact and moving in the same direction.   The land condemned is situated a short distance west of the narrow outlet of the valley, but the conditions, though differing slightly in degree, are substantially the same.  The valley is somewhat wider, but there also the water on the surface and that beneath the surface are in contact and all flowing in the direction of the outlet—on the surface at the rate of two or three feet per second, underground at an estimated rate of from fourteen to seventeen miles per annum.  It appears, also, as stated above, that the Los Angeles river first appears as a surface stream a few miles west of the tract condemned, and gradually increases in volume as it flows to the east.   The fact of this gradual increase in the surface flow of the river, taken in connection with the other facts above detailed, would seem to warrant the inference that the waters of the San Fernando valley, in seeking an outlet to the ocean, flow under the surface as far as they can find room to pass through the bowlders, sand, and gravel which fill the space between the hills on either side, and gradually rise above the surface as the valley narrows and

leaves less and less room for passage underneath. Much the larger portion of an extremely bulky record is filled with the evidence of expert witnesses in regard to the topography of the San Fernando valley, the material composing the valley proper, the amount of rainfall, measurements of surface flow, and a great variety of matters bearing upon this question of a subterranean stream. A careful study of this testimony, which, though conflicting upon many important points, is in reference to the larger and more general aspects of the case quite harmonious, convinces us that it is sufficient to sustain a finding in favor of the existence of a subterranean stream if the law with respect to subterranean streams was correctly laid down in the charge of the court to the jury. There can be little doubt, we think, that the jury, under the instructions of the court, found that the subsurface flow in those lands was a part of the Los Angeles river and governed by the law of riparian ownership, or by a pueblo right still more favorable to the plaintiff. If this was the finding, and if it was made under correct instructions, it cannot be said that the award of compensation is unsustained by the evidence, for, aside from the water flowing in the subterranean portion of the stream as defined by the instructions, there is no evidence to prove the existence of any considerable quantity of percolating water in the tract condemned, and the same evidence which shows an inconsiderable quantity of such water tends strongly to prove that it could all be intercepted or drained by the owners of the adjoining lands before reaching the land taken. That is to say, if the defendants have the right to tunnel or trench their lands below the plane of saturation for the purpose of draining off water which has not yet reached the surface, or subsurface, stream, their neighbors on the north have the same right, and, since only a very small portion of the three hundred and fifteen acre tract is higher than the bed of the stream, the percolating waters which they could drain without interference with the stream would be too inconsiderable in amount, and their right too precarious to add materially to the value of the land. Our conclusion on this point is that the verdict must stand if the jury were correctly instructed, and this brings us to the consideration of the most important questions involved in the case.

6. A great many exceptions were taken to different instructions given by the court, and it is now insisted by appellants that the entire charge was in substance erroneous, and that the court erred in refusing to give the instructions requested by them because they presented the law correctly, while the instructions actually given did not present it correctly. In view of the great number of exceptions to the charge on account not only of what it contains but of what it does not contain, there seems to be no more convenient method of presenting the points to be considered in this connection than by quoting very extensively from the record.

The court charged the jury as follows:

"I. Gentlemen of the jury: This is an action whereby the plaintiff seeks to condemn for public use all the right, title, interest, and estate of the defendants in the lands described in the complaint. The land is situated in and on each side of the Los Angeles river several miles above and north of the city of Los Angeles. The questions arising in the case involving the right of the plaintiff to condemn the property, and the nature and extent of the defendants' estate and interest in the land to be taken, has been determined by the court. The only question you are to decide is the amount of compensation which the defendants are entitled to before their estate and interest in the land can be taken as proposed.

"II. This compensation is to be composed of two parts or elements: 1. The value of the interest and estate of the defendants in the land described in the complaint; 2. The amount of the damages which will accrue to the other land of the defendants, which is part of the same parcel as the land to be taken, by reason of the severance of the land to be condemned and the construction of the works thereon as proposed by the plaintiff. For the purpose of assessing this compensation and damages the right is deemed to have accrued at the date of the summons, which is June 27, 1893, and the actual value at that date is the measure of value for all property taken, and the basis of damages for all property injuriously affected.

"III. The defendants' estate in the lands in controversy is an estate in fee simple, but it is subject to the right of the city of Los Angeles in the waters of the Los Angeles river. This

river flows through the land to be condemned. If the city of Los Angeles had no interest in the river waters, then the defendants would have all the rights of riparian proprietors in those waters. As it is, their rights as riparian proprietors are impaired and diminished to the extent that the rights of the city affect those rights.

"IV. The city of Los Angeles is situated on the river below these lands, and is the owner of the right to take from the Los Angeles river all the water that is reasonably necessary to give an ample supply for the use of its inhabitants and for all municipal uses and purposes for which the city may require water. This right is measured by the necessity, and if the needs increase in the future the right will expand to include all that the needs require. This right of the city is paramount and superior to the rights of the defendants in the waters of the river.

"V. The defendants, therefore, have no right to so use or divert the water of the river as to diminish the same so that it will not furnish the amount needed for the supply of the city aforesaid, and, in determining the value of the land to be taken, this fact must be considered, and the value of the land for which defendants are entitled to compensation is its value subject to the above stated right of the city.

"VI. After the wants of the city are supplied, however, the defendants have the right to use the water of the river on their lands for any and every purpose which does not interfere with the equal rights or injure the lands of other riparian proprietors along the river above and below this land. These rights include a reasonable use of water of the river on the land for irrigation, domestic purposes, watering stock or other lawful purpose; also to obtain power by means of the fall of the stream on the land, returning the water to the stream before it leaves the land; also the benefit of having the water flow in its accustomed manner through the land. The right to use the water to irrigate the land through which it runs is subject to the condition that other riparian owners along the stream have the same right, and, if the water is not sufficient for all, neither has a right to use more than his reasonable share. All these rights are incident to the land because the river borders on the land; and they are not mere appurtenances, but are part and parcel of the land itself.

"VII. In exercising this riparian right the defendants have no right to carry any of the waters of the Los Angeles river off of their riparian land for use on land not riparian, nor can they sell it for use on land not riparian; and all surplus waters must be turned back into the stream.

"VIII. Rights in a subterranean watercourse or stream are governed by the same rules as a surface stream of water; and the only rights that the defendants, as owners of the lands sought to be condemned, would have in any subterranean watercourse flowing through their lands down to and through the lands of others (whether said stream flowed on such lower lands above the surface or beneath the surface of the ground) would be to make the same, but no other, use that they would be entitled to make had such waters flowed on the surface.

"IX. A riparian proprietor is not entitled to divert (for any purpose except for purposes for which he is entitled to make use of, water on his riparian lands as specified in these instructions) any portion of the waters of a watercourse, or stream, whether surface or subterranean; and he cannot by any indirect means make such diversion where he would not have been authorized to do so directly.

"Therefore, a riparian proprietor cannot, by sinking tunnels or making other excavations under the sides or underneath the bed of such watercourse, draw away for use on nonriparian lands any of the waters flowing in such watercourse, although said excavations may not directly touch said stream; if, for instance, the water of such stream percolates into the banks or bed thereof to a considerable but limited distance, and such percolating water is stationary, or has very little motion, said riparian proprietor would have no right to make an excavation so as to draw off said percolating water, if the effect would be to cause any of the running waters of said stream to leave the same in order to fill up the voids left in the banks or bed from which said percolating waters were drawn by such excavation, any more than if said excavation was made so as to tap said stream directly.

"X. The mere fact that some of the subterranean water forming part of the stream on the lands sought to be condemned may be lost before reaching the point where the same would have gone into and made up part of the surface or subterranean

stream of the Los Angeles river, would not give the defendants the right to divert an amount of said subterranean waters in said lands equal to or less than the amount so lost, if such diversion would have the effect of diminishing the waters, surface, or subterranean, of the said river at any point above the south line of the pueblo lands of the city of Los Angeles.

"XI. Whatever additional market value the land may have had by reason of these rights and advantages, so far as they do not interfere with or impair the rights of the city aforesaid, this value the defendants are entitled to as a part of the value of the land, before it can be taken; and this value you must include in your estimate of the value of the land sought to be condemned.

"XII. In addition to these rights and benefits arising from the flow of the river through this land, the defendants are the absolute owners of all such water as may be present in the soil of this land and which does not constitute a part of the water of the river. This is usually called percolating water. There is, however, no magic in the word 'percolating,' and the fact that any witness may apply that word or refuse to apply it to any particular class of waters of which he may speak is not conclusive of the question whether or not such water does or does not form part of the river. That question is to be determined by you from a consideration of the facts proven. The right and ownership of the defendants in this class of waters is distinct from and much greater than their right to the waters of the stream. As to the waters of the stream, they have a right only to the use of it on this land, and they do not own its *corpus*, or its body, or the very water itself, and they have no right to take it away from the land and use it on other lands, or to sell or dispose of it for use on other lands or at other places. But as to this other water, if any there be in this land, not a part of the stream, they are the absolute owners of it, to the same extent and as fully as they own the soil, or the rocks or timber on the land. Therefore if, by any means, they can separate this water from the land, they have an absolute right to the water thus separated and may conduct it away and sell or dispose of it anywhere as they see fit, subject only to the limitation that they may not excavate or do anything on the land

for the mere purpose of intercepting such water and preventing it from flowing into the stream or watercourse on the land of another and without intending to make any beneficial use of it themselves. Whatever additional market value this land may have had by reason of the presence therein of water of this class, or by reason of the feasibility of separating it from the land, or of using it on the land, or of conducting it to some other place for use or sale, or of the great market value of such water for such purposes, or by reason of all these things combined, or by reason of any other lawful benefit or advantage which this water gives, this additional market value inures to the benefit of the defendants and is a part of the compensation to which they are entitled in this case as the value of the land to be condemned.

"XIII. It will be necessary, therefore, for you to determine what waters upon or in this land are a part of the waters of the stream, and what waters are not of the waters of the stream. This question is a question of fact to be determined by you from the evidence, under the instructions of the court.

"XIV. The Los Angeles river is composed of its main stream and any branches it may have, whether surface or subterranean.

"XV. While a watercourse must have a bed and banks or sides, yet such bed may consist of any material which keeps the waters from penetrating below a certain depth, and such banks or sides may consist of any material which has the effect of confining the waters within circumscribed limits.

"XVI. It does not always follow that water which does not flow on the surface in a visible stream is for that reason not a watercourse, or not a part of the water of a stream which does at some place run on the surface; nor need it flow in a defined channel underground as a solid body of moving water of any particular dimensions in order to constitute a watercourse.

"If you find from the evidence that there is a bed or a river bottom filled to a considerable depth with sand, gravel, or other porous material, meandering over which a stream runs on the surface, and through and in which the water moves underground, enough of it rising to the surface to supply the surface stream, and the other portions of the underground water moving with a much less velocity than the surface stream, and through a wider or larger space in and through the interstices

of the porous material, but in the same general direction as the surface stream and in connection with it, and in a course and within a space reasonably well defined, the conditions being such that the existence and general direction of the body of water moving underground can be determined with reasonable accuracy, then that portion of the water thus moving underground should be considered as a part of the watercourse as well.as that part which flows over the surface.

"If such watercourse exists, it is immaterial, so far as the watercourse is concerned, from or through what lands the waters flow in reaching the channel, or whether they reach the same by percolation or by clearly defined streams.

"XVII.   So, also, if you find that the water coming down on the surface in the streams known as the Tejunga, Little Tejunga, and Pacoima creeks, in the northeastern portion of the watershed, is discharged on the plain known as the San Fernando basin, and there sinks in the sand, washes and flows down southwardly underground through sand, gravel, or other material easily permeable by water and along the courses and in channels which have been made by the streams of water from these same creeks flowing on the surface, but which channels were long ago filled up with this porous material; that these waters now flow in these channels beneath the surface to the land in controversy; that on this land there is a range of hills extending easterly and westerly, so as to change the course of these underground channels, and combine or collect the water into one general body of water and force the same to turn and move eastwardly in a similar channel through these lands, and on down along the general course of the Los Angeles river; that upon arriving at this land a portion of the water rises to the surface and flows above ground as the Los Angeles river, and the remainder flows underground along in the same general direction, and in connection with the surface stream, in porous material formerly deposited by the same stream in its bed, then all this body of water, both above and below the ground, should be deemed a part of the same stream from its source to its outlet.

"XVIII. If the jury find that on the lands sought to be condemned there is situated the river bottom of the Los An-

geles river, extending the whole length of said land, and occupy-
ing nearly the whole thereof, and containing all of the subter-
ranean waters of said land, and filled to a considerable depth
with permeable material, consisting of loam, sand, gravel, and
bowlders mixed together and interspersed with irregular and
broken strata masses or pockets of clay, and cemented sand or
gravel, lying in place substantially as deposited by the forces of
nature, and that as the same lies in place the natural voids or
interstices of such material generally throughout the whole of
said river bottom are equal to from one-fifth to one-third of the
entire mass; and that the subterranean waters in said lands enter
the same chiefly from the north and partly from the west sides
thereof from lands composed of substantially the same materials
as the lands sought to be condemned, said waters so entering
under pressure caused by gravity; and that the south boundary
of said river bottom is formed of an impermeable dike of rock
known as the Cahuenga hills; and said waters entering from
said north side are prevented from continuing their flow to the
south and are dammed up by said wall of rock, and that all of
the subterranean waters in said river bottom are thereby forced
to fill all of the said interstices and void places in the material
of which said river bottom is composed to a height in some places
equal to and in some places greater than the level of the sur-
face stream of the river; and that there are no impenetrable and
continuous barriers extending through the said mass in said
river bottom in any direction so as to interrupt and prevent the
substantial continuity and contact of all of said subterranean
waters; and that some of said subterranean waters to the amount
of about one thousand miners' inches constant flow, measured
under a four-inch pressure, being so brought to the surface, en-
ter into and form part of the surface stream of the Los Angeles
river on said lands, so that the amount of said surface flow at
the point where the same leaves said land on the east is increased
by about one thousand inches over the amount of its surface flow
at the point where it enters said land on the west; and that the
remainder of said subterranean waters move underground to the
east, although with a varying velocity and much slower than the
said surface stream, but in the same general direction with it,
off of the lands sought to be condemned and still continuing

CXXIV. Cal.—40

in and through the river bottom of the Los Angeles river, which is composed of like permeable material as aforesaid, and bounded and confined on the southerly, and as it turns to the south, on the westerly side thereof by the same continuous dike of rock; said waters still maintaining their substantial continuity; and that part of said waters rise from time to time as they flow in said river bottom and feed the surface flow of said river; and the remainder of said waters continue to move underground in said river bottom as aforesaid; and that said waters continue to move in that manner for several miles after leaving the lands sought to be condemned, and until said river bottom enters within the limits of the city of Los Angeles, crossing its northern boundary; then the jury must find that all of the subterranean waters contained in the land sought to be condemned are a part of the waters of the Los Angeles river.

"XIX. On the other hand, the law is that innumerable little streams finding their way through the soil, or seeping or percolating through the material of which it is composed, do not become watercourses simply because the amount, when exposed, is visible.

"A watercourse must consist of beds, banks or sides and water, and the water must be flowing in a channel or course more or less defined. It is not necessary that the water should flow continually, or at all times of the year, but neither is a mere swale, in which extraordinary freshets flow, sufficient to answer the definition. To maintain the right to a watercourse or brook it must be made to appear that the water usually flows in a certain direction and in a regular channel, with banks or sides, though it need not to be in a straight line.

"Waters, whether under or above ground, having no certain general course or definite limits, such as those merely percolating through the strata of the earth and those diffused over its surface, are not watercourses, and are not subject to the rules of law applicable to watercourses.

"To entitle an underground stream to the consideration of the law, it is necessary that it be a watercourse in the proper sense of the term. Percolations which spread themselves in every direction through the earth do not constitute watercourses.

"Water moving by force of gravity in a valley or basin of wide extent, say twenty-four by twelve miles at the extreme extent, and moving generally through the whole or through a large portion of the basin, along through the natural voids or interstices of the earth, composed of alluvial or other deposit lying throughout the entire basin, and made up of loam, sand, gravel, and bowlders mixed together, and interspersed with irregular and broken strata or masses of clay or cemented sand and gravel, and lying in place as originally deposited by the forces of nature, do not constitute a watercourse, but are a part of the land and belong to the owner of land as fully as any other constitutent part of it.

"XX. If you find from the evidence that the lands sought to be condemned are situated at the lower portion of and form a part of the San Fernando basin or watershed, near or at its outlet, and that said basin is about twenty-four miles long and about twelve miles wide at the widest point, and that said outlet is from two thousand feet to three miles wide and bounded and defined on the southern side by the rock of the Cahuenga range and on its northern side by a similar rock of the Verdugo hills, and that the earth of which the basin is generally composed, including said outlet and the land sought to be condemned, is an alluvial or other deposit made up of loam, sand, gravel, and bowlders mixed together, and interspersed with broken or irregular strata or masses of clay or cemented sand and gravel, and lying in place as originally deposited by the forces of nature, and that as the same lies in place the natural voids or interstices of such earth, generally throughout the basin, including the defendants' lands and said outlet, are equal to from one-fifth to one-third of the bulk of the entire mass, and that such entire deposit lies upon a grade or slope toward and through the outlet of such basin, and that all the water falling in the watershed of such basin, which is not lost in storm, runoff or by evaporation or in supporting plant life, or held immovable in the ground, sinks into the earth composing such basin, and thence by force of gravity moves down through such voids or natural interstices of the earth throughout the greater portion of the entire mass to the outlet of the basin, through which it passes, without forming anywhere in the

mass any definite course or channel in which it can be ascertained with reasonable accuracy that such water is moving in greater quantities or with greater velocity than in other places, so as to be concentrated in a stream either above or below ground, then such waters so moving through such outlet, or through or in defendants' land in the natural voids or interstices of the earth, do not constitute a subterranean flowing stream or watercourse, but they belong to the owner of the soil in which they may be found, and the portion of them which may be found in the land of the defendants are the property of the defendants. But if such water does collect underground and flows in certain courses or channels through coarse, permeable material therein, where the existence and general course of the flowing or moving body of water can be easily determined, then the water so moving in such channels would constitute a watercourse, although not visible on the surface, and although the space through which the channel extends may be largely filled with the material through which the water flows.

"The burden of proving that waters moving in the ground are flowing in a natural watercourse or in a defined channel, or are a part of a stream, is upon the plaintiff in this action. The presumption is that they are not part of a stream or watercourse nor flowing in a definite channel.

"XXI. A stream which flows along and in a natural channel, at some places flowing on the surface and at some places sinking in porous material which has been deposited in and has filled the channel, and there passing down along in the same channel underground and again rising to the surface and flowing as a surface stream, is no less a stream or watercourse at the points where it flows under the surface than at the places where it runs on the surface. And if part of the water remains moving underground at the places where the surface stream flows, all of the water, both above and below the surface, constitutes the stream. And if at places the channel widens very much and is filled with gravel, sand, or other porous material in which the water spreads so as to fill the voids of the porous material, forming the semblance of an underground lake or reservoir with no water appearing on the surface therein, but with the water passing on beneath the ground down the widen-

ing channel and afterward reappearing below as a surface stream, then the water would be as much a part of the stream while it was contained in such underground lake or widened channel as while it was flowing on the surface.

"And, on the other hand, water which has not formed part of such stream and is not moving in such underground channel, but comes from surface water or from rains and floods sinking into the ground and passing through the soil by gravitation, having no general direction, although it may eventually find its way into some stream or watercourse and materially add to the water thereof, yet while so passing through the ground it is not a stream or watercourse, but is part of the soil and is the property of the owner thereof.

"XXII. In determining the actual value of the land taken, you are to take into consideration all of those factors which enter into and make up its value. The altitude of the tract, the capability of taking to the city of Los Angeles and to the country east and west of it, by gravity, the waters which may be collected on said land, without taking the waters of the natural stream; the amount of water which can thus be collected; the fact that the land sought to be condemned is so situated as to constitute the best place along the Los Angeles river for obtaining a water supply and conducting the same either to the city or other tracts east and west of it; the needs of water in different places within the reach of this tract of land and of the water which may be thus collected thereon—all are circumstances to be considered by you in determining its actual value.

"XXIII. If the jury believe from the evidence that the subterranean waters in the land sought to be condemned are percolating without any definite channel, and that the same are not a subterranean watercourse or stream, and if they believe that such waters come on to said lands from the lands of others above, or pass from the lands sought to be condemned down to the lands of others lying below, and that such upper proprietors could, by the construction of tunnels or other works, cut off or divert said waters, or some part thereof, from the lands sought to be condemned, or that such lower proprietors could construct tunnels or other works on the lands lying below the lands sought to be condemned, which would have the effect of draining or

depriving the lands sought to be condemned of their subterranean waters, to the extent that the owners of the land sought to be condemned could not make a practical use thereof, or of some part of said waters, then the jury are instructed that such upper and lower proprietors would have the same rights so to appropriate said waters on their lands as the defendants would have on the lands sought to be condemned, and the jury must take those facts into consideration so far as they diminish or destroy the value of the rights of the defendants to said waters, or such portion thereof as could be so diverted or drained so as to deprive defendants of the practical use thereof."

We will now take up the specific objections of the defendants to these instructions in the order in which they are stated. The first is to instruction No. 10. It might be a sufficient answer to the objection now urged in the argument to say that it is not one of the objections stated at the trial and specified in the exception then taken. But, waiving that point, it seems clear to us that unless the entire theory of the instruction in regard to underground streams and percolating waters is wrong, this instruction is right, or at least is harmless. The fault found with it is that it denies the right of defendants to divert any part of the underflow on their lands, whether the water diverted would ever reach the surface stream or not. But the instruction is limited to subterranean water which is a part of the stream (as in other instructions defined), and if it is a part of the stream it cannot be diverted, whether it would come to the surface or not. It belongs to the stream and must flow on to the lower riparian proprietor. His right to the subsurface portion of the stream is identical with his right to the surface flow, and is entitled to the same protection. As to the criticism that the instruction is meaningless, it must be admitted that it does not clearly explain itself. But the respondent points out that it refers to a claim made by defendants that a large portion of the subsurface flow was somehow lost from the stream between their land and the city, and therefore they could divert an equal or smaller quantity without injury. If such a claim was made, the instruction was perhaps necessary—if it was not made, the instruction was harmless.

Counsel next criticise instruction No. 12, complaining that

it confounds percolating waters and waters of the stream in such a manner as to render the court's view of the law absolutely un-ascertainable, and to give the jury to understand that, notwithstanding water may be percolating, it may still be a part of the stream. We think the meaning of this instruction is entirely clear, and that the only question is as to its soundness in point of law. The court certainly did intend in this instruction, and in many others, to tell the jury that water passing through the voids of any loose permeable material filling or partially obstructing the channel of a stream is still water of the stream. If it all sinks beneath the surface the whole stream is subterranean; if a part sinks and the remainder flows upon the surface, that which is invisible is as much a part of the stream as the surface flow. The difference between counsel and the superior court at this point seems to be that to them all water passing through sand, gravel, and bowlders is percolating water, and the mere fact of percolation is inconsistent with the idea of a stream, while to the court there is no such inconsistency when the material through which the water forces itself fills a well-defined channel with impervious sides and bed, through which a considerable body of water flows from its source to its resting place. If this view of the court is correct, the instruction is neither erroneous nor obscure.

The quotations made by counsel from instructions Nos. 13, 14, 15, 16, 17, 18, and their criticisms thereon, are all directed to the proposition that the court understood and intended the jury to understand that nothing is essential to the constitution of a subterranean stream except that the general direction of the flow of the water is discoverable. That in this sense the whole San Fernando valley is a subterranean stream, and the jury might as well have been instructed in terms to find that there was in this land no percolating water, the property of the defendants. We do not think the instructions referred to, taken by themselves, necessarily bear this construction, and certainly when considered in connection with those numbered 19 and 20, and others, it clearly appears that the court was not giving, or intending to give, a definition which would make the whole San Fernando basin a subterranean stream. The instructions, taken altogether, are applicable in their definition of a subterranean

stream exclusively to the comparatively narrow outlet of the valley between the Cahuenga range and the Verdugo hills, where all agree that the entire rainfall of the valley passes out, partly on and partly beneath the surface, between the rocky and comparatively impervious mountain sides on either hand. It is true this pass, on the surface, is from one and a half to two and a half miles in width, and that in it borings have been made over a hundred feet in depth before encountering bedrock, but here is not only water moving in a definite direction, but also sides and bed to the channel in which it is moving, and these, also, are comprehended in the court's definition of a subterranean stream. Another objection to these instructions, particularly to number 16, is that they charge the jury upon questions of fact. We cannot see that these instructions are at all objectionable upon this ground. What a subterranean stream must be in order to bring it within the law of riparian rights is a question of law, and the entire scope of these instructions includes nothing but a statement of the facts which the jury must find from the evidence in order to determine whether there is a subterranean stream, and, if so, how much of the water in the land is part of that stream. This is in no wise a transgression of the province of the court. Another objection to several of these instructions is that there was no evidence upon which to base them. We think, however, that there is not only some evidence but very substantial evidence contained in the record tending to prove every material portion of the various hypotheses stated in the instructions.

Before proceeding to a consideration of the numerous exceptions of the appellants to the rulings of the superior court upon the instructions requested by them, it will be convenient to first dispose of the main question in the case, viz., the proper definition of a subterranean stream.

There is no dispute between the parties and no conflict in the authorities as to the proposition that subterranean streams flowing through known and definite channels are governed by the same rules that apply to surface streams. The cases in which this and cognate questions have been raised and decided are innumerable, and it would be an endless task to review or even to name them. No case involving directly the rights of parties

in subterranean streams has been decided in this court, but the law, as applicable to the present case, is well epitomized in section 48 of Kinney on Irrigation, as follows: "Subterranean or underground water courses are, as their names indicate, those water currents that flow under the surface of the earth. A large portion of the great plains and valleys of the mountainous regions of the west is underlaid by a stratum of water-bearing sand and gravel, and fed by the water from the mountain drainage. This water-bearing stratum is of great thickness, the water is moving freely through it, is practically inexhaustible, and, if it can be brought to the surface, will irrigate a large portion of the country overlying it. In and near the mountains many streams have a bed which was originally a rocky canyon, but has been filled up with bowlders and coarse gravel. In this debris a large portion or all of the water sinks from sight, to reappear only when some rocky reef crosses the channel and forces the water to the surface. The movement of this water through the porous gravel, owing to the declivity of the stream, is often quite rapid, and a considerable volume may thus pass down the channel hidden from sight.

"These watercourses are divided into two distinct classes—those whose channels are known or defined, and those unknown and undefined. It is necessary to bear this distinction in mind in our discussion, as they are governed by entirely different principles of law. And in this connection it will be well to say that the word 'defined' means a contracted and bounded channel, though the course of the stream may be undefined by human knowledge; and the word 'known' refers to knowledge of the course of the stream by reasonable inference. Regarding the laws governing these two classes, it must be known that if underground currents of water flow in well-defined and known channels, the course of which can be distinctly traced, they are governed by the same rules of law that govern streams flowing upon the surface of the earth.

"The owner of land under which a stream flows can, therefore, maintain an action for the diversion of it if such diversion takes place under the same circumstances as would enable him to recover if the stream had been wholly above ground. But for this purpose the underground water must flow in known and

well-defined channels, so as to constitute regular and constant streams, in order that the riparian owner or appropriator may invoke the same rules as are applied to surface streams, or otherwise the presumption will be that they have their sources in the ordinary percolations through the soil. This rule practically disposes of the second class of subterranean waters—those whose channels are unknown and undefined—although there are undoubtedly a great many underground streams whose waters flow in confined channels but whose courses are not known, and, following the above rule, these are all classed with percolating waters."

The point to be specially noted here is the meaning ascribed to the words "defined" and "known." " 'Defined' means a contracted and bounded channel, though the course of the stream may be undefined by human knowledge; and the word 'known' refers to knowledge of the course of the stream by reasonable inference."

In this case the boundaries of the channel and the existence and course of the underground stream were unknown and undefined except so far as they could be inferred, but there was a great amount of evidence from which a reasonable inference could be drawn that the channel was bounded and defined by the sloping sides of the Cahuenga and Verdugo hills meeting under ground, and that there was a subsurface flow corresponding with the surface flow from west to east out through the gap. Without any excavation beneath the surface, or other test or experiment, all this could be inferred from the topography of the country, the amount of rainfall and the gradually augmenting volume of the surface stream in its approach to the narrowest point in the pass. And the court was certainly justified in submitting to the jury the question whether the subsurface flow was a part of the stream, unless the mere fact that it was forcing its way through sand and gravel and bowlders deprived it of the character of a stream.

Upon this point we are satisfied that the view of the superior court was the reasonable and just view and not opposed to anything that has ever been decided in this court.

This is in fact the pioneer case of its kind, so far as this court is concerned. There have been cases here in which injunctions

were sought to prevent owners of land from digging or trenching or tunneling in their own premises, upon the ground that they were cutting off the subterranean sources of springs and streams, and they have been uniformly decided in accordance with the accepted doctrine as to rights in percolating waters—the doctrine which defendants contend is applicable here. Those most nearly in point and most relied on are *Hanson v. McCue*, 43 Cal. 178; *Southern Pac. R. R. Co.* v. *Dufour*, 95 Cal. 615, and *Gould v. Eaton*, 111 Cal. 639, 52 Am. St. Rep. 201. But in none of these cases was there any evidence comparable to the evidence here of an underground stream.

*Gould v. Eaton, supra,* comes nearer to this case than either of the others, but in that case it was found by the lower court that the portion of the water as to which there was any controversy was merely feeding the stream by percolation. And even in that case, which went as far as any case has ever gone in favor of the doctrine that percolating waters are a part of the soil and belong to the owner of the land, it was conceded, if not decided, that no water can be abstracted from a surface stream by tunneling beneath it, notwithstanding the water must pass from stream to tunnel by percolation, or filtration through the soil. In this case there is a great amount of evidence tending to prove that the defendants could not take any material quantity of water out of their land without abstracting an equivalent amount from the surface stream, the reason being that the water of the surface stream would necessarily sink into the loose porous material underneath to fill the voids occasioned by the drawing off of the water from below. This, however, is a matter involved in another aspect of the case, the present inquiry relating exclusively to the proper definition of a subterranean stream. Upon this point we hold that the instructions of the court contain a sound and correct statement of the law as it applies and ought to apply to streams of the character of the Los Angeles river. To hold otherwise would be destructive of rights long supposed to be certain and assured. Upon the doctrine contended for by defendants the whole of the Los Angeles river could be diverted from the city, and the sole water supply of a community of over a hundred thousand people completely cut off. For it is not alone the defendants who own water-bearing

lands in the San Fernando valley, and if they can abstract and convey to distant points the water in the land sought to be condemned others can do the same thing. There would be nothing to prevent the driving of tunnels through the Cahuenga range at a dozen points and tapping the water below the level of the surface stream, in such a manner that by extending filtration galleries in sufficient number the whole flow of the river could be abstracted. Once concede that the defendants may draw off the subsurface flow, or any part of it, the same privilege must be conceded to others, and the man or the corporation that can put in the largest tunnel at the lowest level will get the lion's share, while the inhabitants of Los Angeles will get none. The doctrine, therefore, while ruinous to those who have built up a populous and prosperous city upon the faith that they were secure of a supply of water for domestic and municipal purposes, would afford no security to the defendants or to any one in their situation, for what they could take from the city others could take from them.

We come now to consider the instructions asked by defendants and refused by the court.

There was no error in refusing instructions 15, 16, 17 and 18 (fols. 4179, *et seq.*), for they had been given substantially in the charge of the court.

Instruction No. 19 was refused as misleading. We do not see how the jury could have been misled by this instruction as requested, but it, like the others, had been given in substance and without any improper qualification, and, therefore, it was not prejudicial error to refuse it. The instructions 20 to 25, inclusive, were all properly refused upon the grounds stated by the court. They all related to percolating waters and subterranean streams, and, so far as correct, had been given in substance. Instruction 31 had been given in substance and its refusal is justified upon that ground. No. 32 was not law. Nos. 34 and 35 were given in a modified form in instructions Nos. 19 and 20, above quoted. These modifications were certainly proper, and probably necessary to prevent misunderstanding. No. 36 was properly refused as containing the propositions which the modifications just referred to were designed to exclude. It declared that the question of percolating waters or running streams is not

affected by the fact that the subsurface flow has a definite direction corresponding with that of the surface flow, et cetera. These facts do very materially affect the question in this case, and would deserve serious consideration in any case. Instruction No. 33, requested by defendants, contains a sound proposition, viz., that no act of the legislature of California can diminish or change the rights of the defendants in these lands derived from their predecessors, the Mexican and Spanish grantees. But this was a question with which the jury had nothing to do. The court had determined the rights of plaintiff as successor to the pueblo, and had instructed the jury what those rights were; whether its instructions on this point were correct is a matter to be considered when we come to those instructions, but whether correct or incorrect they necessarily controlled the verdict of the jury to the exclusion of all questions as to the effect of the acts of the legislature.

7. We come now to another series of instructions given and refused, relating to the rights of the plaintiff as successor to the pueblo.

It must be borne in mind that this was one of the issues in the case which by agreement of the parties was tried by the court. The instructions given to the jury on this point are, therefore, to be regarded as embodying the findings and conclusions of the court upon that particular issue, and treated accordingly, the only question being whether the decision of the court as to the extent of the city's right in the waters of the river is sustained by the evidence. Instructions 3 to 6, above quoted, embody the views of the court as stated to the jury, and it is claimed that they are erroneous in several particulars. It is still more strongly insisted that the court erred in refusing instructions 12, 13, and 14, requested by defendants, which read as follows:

"XII. The rights of the ancient pueblo of Los Angeles, whatever they may have been, were not attempted to be granted by the legislature to the city of Los Angeles, except to the extent of four square miles, and could not, under any circumstances, have extended beyond four square leagues.

"XIII. The uses to which the pueblo was authorized to apply the water was such purposes as appertained to the Spanish

pueblo, under the civilization of those times, and it did not extend to the cultivation and irrigation of parks, or the creation and maintenance of artificial lakes therein, or supplying waters for an outfall sewer.

"XIV. The said pueblo of Los Angeles had no paramount rights to the use of the waters for any purpose, as against those grantees of the Mexican government under whom the defendants here claim; but the raising of stock, and tilling the land, granted by the Mexican government to these grantees, were as much parts of the policy of the Spanish and Mexican government as the founding of pueblos and promoting the progress of those towns. And rights to the use of water by the grantees of these ranchos for domestic uses, and stock and agricultural purposes, were protected by the laws and policies of those governments, as well as the interests of inhabitants of towns."

In discussing this branch of the case it will not be necessary to take up seriatum the particular exceptions reserved by the defendants to the giving and refusal of these various instructions. It will be sufficient to consider a few general propositions to which they give rise.

The pueblo of Los Angeles embraced four square leagues (something more than seventeen thousand acres) of land. The city of Los Angeles as originally incorporated embraced the same area, but, by successive amendments to its charter, its area has been about doubled by the addition of lands outside of, but contiguous to, the original pueblo. Within the city several parks have been laid out in which there are artificial lakes of considerable size, with lawns and shrubberies requiring irrigation. An outfall sewer has been constructed, through which the sewage of the whole city is carried to the Pacific Ocean, requiring a large amount of water; the population of the city exceeds a hundred thousand and it is rapidly increasing.

The defendants hold their lands as successors to several Spanish and Mexican grantees, under patents from the United States based upon the original grants. They claim that, even conceding the rights of the pueblo and the city's succession to those rights (a concession which they make only for the purposes of the argument on this point), they are still, by virtue of their ownership of the lands in question, entitled to the exercise of

full riparian rights, except so far, and so far only, as those rights are impaired by the paramount rights of the pueblo as they existed before the change of flag and without any legislative addition thereto.

This claim, we think, is clearly just. The legislature of California could grant nothing to the city of Los Angeles which belonged to others, and the rights of the city, as successor to the pueblo, in the lands of riparian proprietors holding under Mexican and Spanish grants, cannot exceed the rights of the pueblo itself.

This being so, the facts above detailed regarding the growth and extension of the city, and the municipal uses to which it is applying the water drawn from the river, give rise to the questions upon which the charge of the court and the instructions requested by the defendants so radically differ.

By instruction No. 4, above quoted, I understand the court to have charged the jury that the defendants had no right as owners of these lands to take any water from the river for irrigation, watering stock, or even for domestic purposes, if by so doing they would deprive the inhabitants of the present or future city of Los Angeles of an ample supply for all domestic and municipal purposes.

I think this instruction is erroneous. If the paramount right of the city is only the right of the old pueblo, to which it succeeded, I cannot see how such right covers the requirements of that large portion of the present city outside of the four leagues constituting the pueblo. The inhabitants of that limited territory, to whatever number they may increase, enjoy the full pueblo right, but beyond that territory the right does not extend. The city, of course, has the power to provide water for all its inhabitants and for all public purposes throughout its extended limits, but if, in order to supply the territory outside of the pueblo boundaries, it finds itself compelled to encroach upon the riparian rights of land owners along the river, it ought to pay for those rights the same as for any other private property taken for a public use.

This is not the same proposition involved in the case of the *Vernon Irr. Co. v. Los Angeles*, 106 Cal. 237, but it is governed by the same principle, and that case is authority, if authority were required, for my conclusion upon this point.

As to the public purposes for which the city may use water in the exercise of its paramount right, the question is not of such easy solution. The view of the defendants is set forth in the instructions requested by them, numbered 13 and 14, *supra*. No. 14 I think erroneous, because it denies to the pueblo any paramount right for any purpose. And No. 13, I think, is also erroneous in limiting too strictly the purposes for which the city, as successor to the pueblo, has a paramount right to the use of the water of the river. It is certain that irrigation of the pueblo lands was one of the purposes for which the pueblo could take the water, and the fact that some of those lands have been converted into ornamental parks does not impair the right to irrigate them. An outfall sewer is something which I suppose was never contemplated in the foundation of a Spanish or Mexican pueblo, but this was because the modern system of water supply for domestic purposes and modern methods of house drainage were then unknown. These improvements have made an outfall sewer necessary for the health and convenience of the inhabitants of Los Angeles, and since the water was granted or dedicated as much for the health and convenience of the pueblo as for any other purpose, and since it has been practically settled that the pueblo right expands with the increasing needs of the inhabitants, the right to drain the city by means of an outfall sewer, and to keep the sewer in a state of efficiency by the necessary flushing, must be held to be fairly within the pueblo right.

But the maintenance of artificial lakes, by which undoubtedly a large quantity of water is lost through absorption and evaporation, never was necessary for the support or health, or convenience of the inhabitants of the pueblo, however much it might have contributed to their pleasure, and I know of no principle upon which their right to use the waters of a river for such a purpose could have been deemed paramount to the ordinary rights of riparian proprietors. It was not only the policy of the Spanish and Mexican authorities to foster the growth of the pueblos, but also to encourage the raising of stock and other rural industries to which the use of water for domestic purposes, the watering of stock, and irrigation were essential, and it is not to be believed that in the primitive condition of society in those times, when the settlement of the country and the support of its

inhabitants was the primary consideration, the most favored pueblo would have been allowed to consume in the maintenance of ornamental fountains and artificial lakes water necessary to the sustenance of an essential branch of industry.

8. But the appellants go still further, and contend that when the land in controversy was granted to their predecessors there was no pueblo of Los Angeles, and consequently no pueblo right to which any of their rights could be subordinated. This contention is based upon certain executive orders of departmental officials made in pursuance of a Mexican law of 1837, by which the pueblos containing less than a certain mimimum of population were deprived of their ayuntamientos. Under this law the ayuntamiento of Los Angeles was abolished or suspended for a time. But we do not understand that the pueblo was extinguished, or its rights to the waters of the river at all impaired by the abolition of the ayuntamiento. The only result was that its affairs were administered by a prefect, or other officer appointed by the central authority, instead of by a local council. This question, however, ought to be considered closed by the previous decisions of this court in the Vernon Irrigation Company's case and others. All of the laws and public documents upon which its solution depends are within the judicial cognizance of the courts, and whether they were actually noticed or not in previous decisions they must be deemed to have been considered and allowed their due weight. The question is one of law, rather than of fact, and its decision in one case is a precedent in others.

9. Another series of the instructions given and refused deals with the measure of compensation applicable generally in condemnation suits. Of the instructions above quoted, those numbered 2, 11, 22, and 23, relate to this matter. Exceptions were taken to these instructions, and also to each of the following:

"XXV. In determining the actual value at the date of the summons you are not to take, as the measure of that value, what an owner could realize at a forced sale, but the price he could obtain, after reasonable and ample time, such as would ordinarily be taken by an owner to make sale of like property; and in making that estimate you should consider the use for which the property is suitable, having regard to the existing business or

wants of the community, or such as might have been reasonably expected in the immediate future. You will also consider the fitness of this land for agriculture, and its value for that purpose, and for fruit or stock raising, for the timber growing on it, as well as the water which may be in the soil, not a part of the river; and from these and all other uses to which the property may be put from which profit may be derived, and from all the evidence on the subject, you will determine its actual market value at that date.

"XXVI. The market value of the land is not necessarily the value of the land in its present or prospective use to the owner; nor is it the value which it would be to the city as a location for headworks; nor the sum which the city must be compelled to give for it by reason of the necessity it may be under to obtain it; nor is it the sum that could be derived from the land for any special purpose for which it may be suitable. All these things, if shown by the evidence, may be considered as bearing on the question, but only so far as it may appear that they affect the actual market value at the date of the summons, and the thing you are to determine is such actual market value at the date stated.

"XXVII. Although you may believe from the evidence that by reason of things done, discovered, or ascertained since June 27, 1893, it now appears that the land was then more valuable for any purpose or use than it was then known to be; yet you cannot consider such additional value unless you believe also that these things were sufficiently known or obvious in June, 1893, to affect the market value at that time, and did so affect it.

"XXVIII. If the jury find that any of the underground waters of the lands sought to be condemned are not a part of the waters of the Los Angeles river, they can consider that fact in fixing compensation only so far as it tended, if at all, to affect the actual market value of the land at the date of issuing the summons, disregarding any acts done upon the lands or information acquired concerning said waters since said date.

"XXIX. You are entitled to consider the evidence regarding the quantity of subterranean waters in the lands in question, and their value, only in arriving at a just determination of the market value of the lands sought to be condemned on the

twenty-seventh day of June, 1893; wherefore, if you believe that said waters did not give said lands an additional market value at that date, or that, if an additional market value were given, the same did not equal the real value of said waters, then you must place on said lands a valuation equal only to the market value which they then had, including such additional market value which said waters gave to said lands, irrespective of the true value of said waters.

"If, for instance, said lands could not have been sold in the market on said date (the owners having had abundant time to find a purchaser, such as would generally be taken by an owner trying to sell like property) for more than a certain sum, then you must not find the value of said lands to be greater than said sum, although, in fact, you may believe that the waters in said lands made them worth more than that sum."

One of the objections to these instructions which the appellants urge in the argument here is directed against the charge repeated in several places that the value of the property at the date of the summons must control.    The hardships of this rule, when applied to a case in which so long a time elapses between the issuance of summons and the trial of the cause, as happened in this instance, are strongly stated by counsel, and their argument against the constitutionality of this feature of the statute would not be undeserving of consideration if they were in a position to urge it.    But the fact is, this portion of the charge was given in form and in substance as they requested it in the instructions proposed by themselves, and they cannot, therefore, claim that the court erred in allowing it.

Another objection is that the court confuses "actual value," which is the true measure of compensation (Const., art. 1, sec. 14, and Code Civ. Proc., sec. 1249), with "market value" and "actual market value," in such a way that the different instructions are either self-contradictory or unmeaning.    We do not think the instructions are self-contradictory, and their meaning we take to be this: "Actual value" is the measure of compensation, but " market value" is the criterion of actual value, and the definition of market value is given in the instructions numbered 25, 26, et cetera.    If, then, these instructions lay down a correct rule for ascertaining actual value, the charge as

a whole is not erroneous. In most respects the charge is sustained by previous decisions of this court (*San Diego etc. Co. v. Neale,* 78 Cal. 63; *Spring Valley W. W. v. Drinkhouse,* 92 Cal. 528.) But there is one objection strongly urged in this case which was not involved and could not have been considered in any case formerly decided here.

In several of these instructions the jury are told in effect that in estimating the value of these lands they must not take into consideration any fact discovered since the summons was issued. In other words, to use the illustration put by appellants, if a gold mine worth millions of dollars had been discovered in this land the day after the issuance of summons, the city could take the land by paying its value for agricultural purposes.

This conclusion, it is true, follows logically from the proposition that market value at the date of the summons is to control, and that is the idea upon which the instructions are based. But I think this is a mistaken idea. The thing to be ascertained is not market value, but actual value (Code Civ. Proc., sec. 1249), and the only reason why market value is taken as the criterion of compensation in ordinary cases is because it is in such cases the true measure of actual value—the only practical test. But in a case where discoveries made after the issuance of summons demonstrate that the actual intrinsic value of the land at that date was greater than its market value—in other words, when it appears that market value is no criterion of actual value—those discoveries should be taken into consideration. As such discoveries were claimed in this case, I think the court erred in giving and refusing the instructions referred to.

10. The giving of instruction 9 is complained of upon the ground that there was no evidence upon which to base it. Unless we have greatly misunderstood the defendants' position, the instruction meets one of their claims to percolating waters, but if they do not claim the right to undermine the surface stream and draw off its waters the instruction did them no harm. It stated the law correctly.

And so, also, does instruction 23 lay down a correct rule clearly applicable to the case. The point for the jury to determine was the value given to these lands by percolating waters not a part of the stream—waters which the owners of the land

had a right to convey to a distance for sale. In considering the value of such waters it was certainly material to consider at the same time whether the defendants might not at any moment be wholly deprived of them by the exercise on the part of others of the same right in their lands claimed by defendants with respect to their own.

Instruction No. 29, requested by defendants, and refused by the court, has so remote an application to the questions to be decided by the jury that its refusal cannot be deemed an error.

Instruction No. 33, requested by defendants, was properly refused, because it related in great part to the issues to be determined by the court.

Instructions 34, 35, and 36, requested by the defendants, were given in a modified form, and the modifications were proper.

11. A great many exceptions were taken to rulings of the court on objections to testimony and documentary evidence.

Some of the questions raised by these exceptions have been practically decided in discussing other points. As to the rest it is sufficient to say that, although some evidence was admitted that does not appear to have been clearly relevant, it could not have been prejudicial. The evidence actually admitted without objection took a wide range, and the most of the objections were to questions asked of expert witnesses on cross-examination. In respect to such questions the court is necessarily invested with a large discretion. In this case some objections were sustained that might have been overruled without error, and some were overruled that might have been sustained; but we cannot see that the court abused its discretion in any instance or that it would have made an appreciable difference in the result if the ruling had been the reverse of what it was.

12. It is contended that the evidence is insufficient to justify the verdict of the jury or the findings of the court.

Since the conclusions above stated involve a retrial of the issues submitted to the jury, I deem it unnecessary to notice the first branch of this proposition, and my remarks will be confined to the second.

Does the evidence sustain the findings upon the issues tried by the court?

I think that there is substantial evidence to sustain every

finding that is material. The taking of the three hundred and fifteen acres may not have been shown to be absolutely and certainly essential for the supply of the present needs of the city, but, in view of the rapid increase of its population and its probable increase in the future, in view of the possible necessity of enlarging the number and of changing the location of the filtration galleries, in order to insure an ample supply of water at all times, and for every emergency, the court was justified in finding that it was a wise and prudent measure to secure the entire tract. And there was evidence to sustain the finding that unless the city had the exclusive control of the surface there was at least a possible danger that the water supply might be polluted by stock herded or pastured there. This, however, is not very material, because it bears only upon the question of taking a fee simple estate, and the right to take such estate rests securely upon the fact that the land is taken for a reservoir.

The third finding, which relates to the paramount right of the city as successor to the pueblo, is sustained by the evidence, except in so far as it carries the meaning of those portions of the instructions above considered which are pronounced erroneous.

The evidence does not show any formal adoption by the city, prior to the commencement of the action, of the detailed plan of these headworks alleged in the complaint, but it does show a previous adoption of engineer's report recommending in general outline and in all essentials the plan here set forth in detail. It shows, also, by a series of resolutions and orders of the council a fixed purpose on the part of the city to own and control its own system of water supply, and a resolution of the council directing the city attorney to commence this proceeding as soon as the ordinance of June 8, 1893, should be signed by the mayor. This probably accounts for the rather precipitate action of the city attorney in filing the complaint the same day that the ordinance was passed and before its publication. This, however, would have been but an irregularity in the absence of the resolution. The object of publishing laws and ordinances before they take effect is to warn those who are to be bound by their provisions. In a case like this, where an ordinance has been duly passed and an order for its publication has been duly made, the act of an officer obeying its directions, in anticipation of its publication,

is at least ratified and made good when the publication is complete. Moreover, in this particular class of cases the action is not commenced until the summons is issued. (Code Civ. Proc., sec. 1243; *Pacific Coast Ry. Co. v. Porter*, 74 Cal. 261.)

It appears, also, that since the commencement of the action it has been followed by other orders and resolutions of the council providing means for carrying out the proposed plan and complying with the terms of the judgment sought. In view of all these facts the objection that the action was commenced without authority in pursuance of a plan not formally adopted seems too purely technical to be regarded.

Other specifications under this head relate to findings of facts merely probative, included in the issue submitted to the jury, and need not be further considered.

13. At the beginning of the trial of this action the parties made an arrangement with the official reporter out of court, in pursuance of which he furnished each of them a daily transcript of his notes at an agreed rate of compensation. The cost of defendants' copy was seven hundred and sixty-seven dollars and forty-five cents, and this sum they included in their bill of costs. On motion to retax the item was stricken out by the court. This is assigned as error, and section 274 of the Code of Civil Procedure, as amended in 1885, is cited in support of the assignment. But this amendment has been held unconstitutional (*Smith v. Strother*, 68 Cal. 194), and the case is governed by section 274, as amended in 1880, and construed in *Barkly v. Copeland*, 86 Cal. 493. The court did not err in this ruling.

For the reasons stated in the foregoing opinion I think the judgment and order of the superior court should be reversed, and the cause remanded for a new trial as to the single issue of compensation and damages—the issue, that is to say, which was submitted to the jury on the former trial.

TEMPLE, J.—I concur in the views expressed by the chief justice, except as to that part of the opinion in which certain rulings made by the trial court are declared erroneous.

1. The first has regard to the time when the property is to be valued. The statute declares that the right to the property shall be deemed to accrue at the date of the summons, "and its actual value at that date shall be the measure of the compensation."

The chief justice concedes that ordinarily market value is the true measure and the only practical test of the actual value, still, "in the case where discoveries made after the issuance of summons demonstrate that the actual intrinsic value of the land, at that date, was greater than its market value—in other words, when it appears that market value is no criterion of actual value—those discoveries should be taken into consideration." Such discoveries are claimed in this case. (Code Civ. Proc., sec. 1249.)

It is said if a gold mine worth millions of dollars had been discovered in this land the day after summons was issued, the city could take the land by paying its value for agricultural purposes.

The supposition is an impossible one. A gold mine of the known actual value of millions could not be so discovered. The phrase "actual value" is here used in opposition to the phrase "market value." It is difficult to give any meaning to it when so used, but in regard to a gold mine it must have reference to the amount which could be taken out of it over and above the cost of extraction. This could not be known until the mine was worked out, and therefore whenever it was valued necessarily the value could not be the actual intrinsic value, as defined, but would necessarily be its market value. So the proposed value only changes the statutory date at which the right of the city is deemed to accrue, and when the value is to be estimated. It is contended that the right must be deemed to have accrued and the valuation be made after other elements of value have been discovered.

The phrase "actual value" is sometimes used in contradistinction to market value to indicate that property is valued too high to make it a good investment. If the market value of the land was one hundred dollars per acre, it would not be permissible to show that the real or actual value was less and that the market value was inflated. The owner could get the market value and less would not make him whole. The government can take private property for its uses at any time conditioned only that the public shall compensate the owner, that it shall pay what it is worth when taken. This value must be the market or exchange value, for there can be no other. Value, which

determines the price at which the owner must sell, must be the exchange or market value, and actual value means actual market value.

2. It is said the paramount right of the city to the water of the river does not extend to water required for residents in that part of the city which is not within the boundaries of the pueblo, and that the court erred in charging the jury, in substance, that all riparian rights were subordinate to the right of the inhabitants of the present and future city to the use of water for all domestic and municipal purposes.

It is argued that the city has succeeded to the rights of the old pueblo, and its rights cannot exceed the rights of the pueblo itself. If so, I do not see how the city can take water even for that portion of the city which is within the ancient boundaries, for uses which were not only unknown to the inhabitants of the pueblo, but which, owing to the plan of the settlement, could not have been thought of as possible uses. Relatively only a small portion of the territory was devoted to building lots. Provision was made for agricultural and pastoral pursuits, and large portions of the territory were laid out in montes, wood lots, dehesas, commons for cattle, ejidos, places for threshing grain, and recreation, and many other tracts were kept for the community. But this was a plan for a primitive villege, to aid and encourage the settlement of the country. The sites for pueblos were carefully chosen in pursuance of the royal regulations of Spain, whose policy was that the government should determine where towns and cities should be built. Unquestionably it was contemplated and hoped that at least some of them would so prosper as to outgrow the simple form of the rural village. It is in the nature of things that this might happen, and when it did, and the communal lands were required for house lots, we must presume that under Mexican or Spanish rule they could be so converted, and that when the population increased so as to overflow the limits of the pueblo that such extension could be legally accomplished. Had this happened under Mexican rule, can it be doubted that the right vested in the pueblo would have been construed to be for the benefit of the population, however great the increase would be?

I cannot see why the interpretation of the original grant

should be more narrow than of a title acquired by condemnation. If the city should now in this proceeding purchase the riparian rights for the use of the city, must it do so again whenever its present limits may be enlarged?

Suppose in 1850 the little city then existing had condemned for its use all riparian rights, and had no other right to the water. The extent of a taking by condemnation is always limited to the necessity which justifies it. That which is not used still belongs to the owner. The title to water would not be acquired, but only the use, and as against the riparian owners, in such a case, the city could not have taken water not needed by the city and its inhabitants. In 1850 the city contained only a small population, and its corporate limits were less even than the pueblo limit. In the supposed case could the landowners now contend that the larger city could not, under the right acquired in the condemnation proceedings, supply the inhabitants of the additional territory? As to such a claim I think there would be but one opinion, and that would be that in the condemnation proceedings all possibilities as to the future growth and requirements of the city were taken into consideration.

3. I have never been able to see anything in the objections to the outfall sewer. It seems to me if the city cannot maintain this, it cannot be a city at all and retain the water rights of the pueblo.

4. The last matter of difference relates to water used in the ponds and artificial lakes. The real objection to this seems to be that it looks like extravagance or waste. We feel that where water is so precious it should not be used for mere matters of taste and fancy, while those who need it for useful purposes go without.

In the forum of morals this may be so, but the needs of a city are understood to include such uses as well as for the supply of absolute necessities. It would be intolerable to invest in outside authority a right to superintend and limit such uses. While, therefore, I am not prepared to say that the discretion of the municipal authorities could not under any circumstances be interfered with, I do not see how we can do so here. It is clearly a municipal use which is familiar in municipal history.

The judgment and order are affirmed.

McFarland, J., Henshaw, J., Garoutte, J., and Harrison, J., concurred.

Rehearing denied.