[Civ. No. 11467. Third Dist. July 30, 1968.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Respondent, v. SHASTA PIPE AND SUPPLY COMPANY, Defendant and Appellant.

THE STATE OF CALIFORNIA ex rel. DEPARTMENT OF WATER RESOURCES, Plaintiff and Respondent, v. FEATHER RIVER INVESTMENT COMPANY, Defendant and Appellant.

(Consolidated Cases.)

---

Thomas C. Lynch, Attorney General, Paul M. Joseph, Deputy Attorney General, Harry S. Fenton, John B. Matheny and Edward J. Connor, Jr., for Plaintiffs and Respondents.

Corkin & Corkin, David Livingston, David P. Kassoy and Thomas Corkin for Defendants and Appellants.

RECKERS, J. pro tem.*—Two consolidated cases are here on appeal by the defendants from final judgments of the Superior Court of Butte County. The judgments awarded compensation for property taken in eminent domain proceedings and decreed further that defendants were not the owners of additional property claimed by defendants and which also was devoted to public use by the plaintiff State of California. The defendants have also appealed from orders denying their respective motions for new trial but said orders are not appealable.

In 1961 the Department of Public Works commenced a proceeding to acquire various parcels of property in Butte County, including parcels in the estate of Nellie Ford, but which were conveyed to defendant Shasta Pipe and Supply Company before trial. Another complaint was filed by the Department of Water Resources in 1962 to acquire various parcels, including property of defendant Feather River Investment Company, but which had also been a part of the Ford estate. The Department of Public Works complaint was based upon a resolution stating that the property in question was being acquired for "freeway purposes." The Department of Water Resources complaint was based upon a resolution to acquire the property as part of the "Feather River Project."

The above cases were consolidated for trial. Preliminary issues relating to the area and extent of the land ownership of defendants and appellants were tried by the court prior to the issue of valuation which was tried before a jury.

The issues as between plaintiff state and each of the defendants as to the boundary portions of the case were identical before the trial court and are identical before this court so it is unnecessary to consider the claims and contentions of the defendants separately.

In order to understand the precise issues that were before the trial court during the boundary phase of the case, certain geographical data must be considered as it was developed in the evidence presented. The issues, as formulated for trial, will also be explained.

The Feather River flows in a general southerly direction from its source in the mountains above Oroville to its conflu-

*Assigned by the Chairman of the Judicial Council.

ence with the Sacramento River between Marysville and Sacramento. However, as it passes the City of Oroville, the river in its downstream course swings in a westerly direction for some distance and then turns south once more. During the early 1860's the channel of the river opposite Oroville moved a considerable distance south of its natural location due to hydraulic mining operations in the immediate area and upstream. In the early 1940's the channel was straightened and moved still farther south of its original location as a result of further mining and dredging operations.

The real dispute in this case relates to ownership of the land between the north line of the original river channel and the center line of the river in its present location.

The defendants' title to land north of the north bank of the river in its original location was derived from a Mexican land grant known as the Fernandez Rancho. A confirmation patent of the Mexican grant was issued by the United States government in 1857 and referred to the description and "Plat of the Fernandez Rancho" as surveyed by one A. P. Green.

In the first of the two condemnation proceedings filed, the Department of Public Works in its complaint set forth a metes and bounds description of the property owned by the estate of Nellie Ford, the predecessor of defendant Shasta Pipe and Supply Company. It described the southerly boundary of the property as meandering up the center of the Feather River.

Subsequently, this complaint was amended so as to contain a different description which incorporated a meander line of the north bank of the Feather River as fixed by the Green survey of the original confirmation patent. Thus, the new description did not contain the part which carried to the center of the river in its present location or as referred to as the meander line of the center of the river in the original complaint. When the complaint of the Department of Water Resources against Feather River Investment Company was filed, the plaintiff was careful to describe the property as owned by the defendants only on the north side of the Green meander line as in the amended complaint in the Department of Public Works action. In both actions a further allegation was made to the effect that if defendants established ownership of property south of the Green meander line and north of the river in its present location, it was to be condemned likewise. In both actions orders of possession were obtained at the

outset, and the state actually took possession of all lands to the north bank of the river in its present location.

The answers of the respective defendants set forth their claims of ownership as to all land lying north of the thread of the Feather River in its present location.

In due course the consolidated actions were pretried. In its pretrial statement the plaintiff state, among other things, contended that the Feather River was a navigable stream at the time California was admitted to the Union. It also contended that since the river was navigable the state acquired title to the bed of the stream at the time of admission. In their pretrial statements the defendants contested the title of the state as to any property lying south of the rancho boundary and north of the center of the river in its present location. The pretrial order of the court, however, was silent as to whether the state had any obligation to establish title to any property south of the rancho boundary and north of the river in its present location but did set forth as an issue the question of whether defendants had acquired title to any property south of the original rancho boundary by adverse possession. The pretrial order also provided for the trial of the boundary questions by the court without a jury in advance of the valuation issues to be tried by the jury. The pretrial order was later amended to provide that if severance damages were being claimed in one of the actions, the amount was to be set forth by way of amendment to the answer prior to the commencement of trial on the boundary issues.

After several days of trial on the boundary issue, the matter was submitted to the court. The court wrote a comprehensive opinion indicating that the meander line of the north bank of the Feather River, as shown by the Green survey of 1857, was the south boundary of any lands owned by defendants; that the river was navigable when California was admitted to the Union and that as a result of its navigability title to the bed of the stream vested in the state and any deeds of conveyance which called to the center of the river would convey to the bank only. The court also indicated in its written opinion that the defendants had no interest whatever in any land or property lying to the south of the Green meander line as established from the 1857 patent confirmation survey and held that the movement of the channel was caused by artificial rather than natural means so defendants and their predecessors had not acquired any title to lands south of the Green

meander line by accretion. The court also concluded that defendants and their predecessors had not established any title to any lands south of the Green meander line because the state was the owner of the property and adverse possession could not be established by defendants for that reason, and also for the reason that defendants had not shown an actual use for five continuous years. There was evidence that defendants and their predecessors had color of title for about sixty years; that they had paid whatever taxes were levied or assessed against the property by the County of Butte; and that they had been in possession, if anyone had been in possession, for the whole period and had exercised various acts of dominion and ownership during the period.

At the time the trial court rendered its decisions, the defendants moved for written findings and also requested that the court find that the plaintiff state had not established its title to any property in the area of dispute to the south of the Green meander line. Defendants also requested the court to find that defendants had title based on color of title and possession which they claimed was a good title and one that required purchase in condemnation in the absence of a showing of better title.

The court correctly refused to make findings in advance of the valuation portion of the trial, but when they were made at the time of and preceding the final judgments the contention of defendants that their title was sufficient in the absence of a better title was again presented by way of objections to the state's proposed findings and proposed findings were submitted by defendants.

It should be noted that defendants did not make formal objection to the pretrial statement as signed by the trial court, but they did submit their own proposed statement. They also objected to the state's failure to prove its own title and requested findings with respect to the state's title at the end of the boundary phase of the case and again before entry of final judgments.

The defendants' contentions on appeal may be briefly listed as follows:

1. The trial court erred in placing the burden upon defendants to prove their title to the disputed areas.

2. No evidence was produced at the trial to establish the state's interest in the disputed land, at least from the south bank of the original channel to the north bank of the present

channel. By seeking to acquire the property, the state must pay for it.

3. The court erred in holding that the Green survey of the meander line of the north bank of the river was in fact the south boundary of the rancho. That a large area between the meander line and the actual bank was taken without compensation because the bank and not the meander line was the actual boundary of the rancho on the south side.

4. The court decided the adverse possession issue upon the erroneous theory that the state owned the property and that the defendants were required to prove adverse possession against the state.

5. Defendants' predecessors acquired title to the original stream bed by adverse possession.

6. Since defendants had title to the north bank of the present river, it follows that they own to the middle of the stream.

In addition to the foregoing, the defendants claim that several errors occurred during the valuation part of the trial. We will defer a discussion of the other claimed errors until after evaluating the defendants' contentions above with reference to the boundary phase of the case.

Contention 6 above does not require consideration because plaintiff state is not contending that it owns the bed of the river in its present location, and it has not been taken or used by the state. The other contentions of the defendants will be treated together.

Defendants claim that the trial court improperly saddled them with the burden of proving their title in the two actions and assumed that title was in the state as to the portions of the area over which defendants claimed title by adverse possession.

Plaintiff refers to several cases which indicate that the burden of proof follows the burden of pleading and that since the eminent domain sections of the Code of Civil Procedure require that a defendant set forth the nature, extent and value of his interest, it follows that he has the burden of proof as to his title as well as to the value of his interest.

Both sides in the case have cited and rely upon *City of Los Angeles* v. *Pomeroy* (1899) 124 Cal. 597 [57 P. 585]. We agree that a careful reading of that case gives a clear indica-. tion as to the duties of both a condemnor and a condemnee with reference to pleading and proof.

Before discussing the *Pomeroy* case we should examine the statutory requirements as to pleading. Section 1244, subdivision 2, of the Code of Civil Procedure states that the complaint *must* contain (with reference to defendants) : "The names of all owners and claimants, of the property, if known, or a statement that they are unknown, who must be styled defendants."

Section 1244 goes on to require that a description of each piece of land or interest sought to be taken be set forth in the complaint, but provides that the nature or extent of the interests of the defendants need not be set forth.

If we turn to section 1246 of the Code of Civil Procedure, we find that each defendant must, by answer, set forth his estate or interest in each parcel of property described in the complaint and the amount he claims for each of the items of damage specified in section 1248. Section 1246 further provides for the voluntary appearance of persons in occupation of or having or claiming an interest in the property described in the complaint. In addition to the sections of the Code of Civil Procedure referred to above, section 1245.3 of the same code provides for service upon possible unknown owners and claimants by posting and publication of summons and the deposit in court of the value of the property taken from said unknown owners as their interests may be determined by the court.

In the ordinary condemnation proceeding the condemnor describes the property it wishes to acquire and names the record owners as parties defendant. The defendants answer, admitting their ownership and allege the amount of their damages. There is seldom any controversy between the condemnor and a condemnee with reference to title, although several claiming condemnees may have a controversy among themselves. The condemnor is not interested. It pays the amount of the award and awaits a determination as to who is entitled to it.

In the present case, however, we have a somewhat unusual situation. The plaintiff condemnor is itself claiming an interest in the property which it seeks to occupy and use as a result of this condemnation proceeding. Under the circumstances, should it not be required to allege and prove exactly what it seeks to acquire, and also what its own interest is, if any, in the property it seeks to use and occupy? It appears to us that *City of Los Angeles* v. *Pomeroy, supra,* (124 Cal. 597)

requires that we answer these questions in the affirmative. We turn now to a consideration of *Pomeroy*.

In *Pomeroy* the plaintiff city claimed that it was the owner of the entire flow, both subterranean and above ground, of the Los Angeles River as it left the San Fernando Valley on its way to the city and ocean. The city sought to condemn a strip of land occupying both sides of the river in the area where it left the valley. The city required the land for the purpose of building waterworks to increase the flow of water in the watercourse. The defendants owned the lands and denied the rights of the city to the waters of the river. The defendants moved to strike the complaint as seeking to condemn the land of defendants while at the same time claiming the water which was its chief value. The motion was denied and the parties then stipulated to a bifurcated trial to determine the interest of the city in the waters and thereafter to submit to a jury the question of compensation to the defendants for the interests condemned. At the conclusion of the first part of the case, the trial court, as in this case, announced its decision but refused to make formal findings until the jury had determined the valuation issue. The defendants claimed on appeal, as do defendants here, that the rulings of the trial court were tantamount to causing the action to become one to quiet the city's title to the waters of the river, but the Supreme Court held that Code of Civil Procedure section 1247 gave the trial court power ''to hear and determine all adverse and conflicting claims to the property sought to be condemned, and to the damages therefor.'' (P. 609.) The Supreme Court further held that while the quoted section referred only to claims of defendants, it contained an express legislative recognition of the entire competency of the trial court to try and determine adverse claims to the property in a proceeding to condemn, and then proceeded to decide that the trial court acted properly in determining the plaintiffs' own interest before submitting the valuation part to the jury under appropriate instructions as to the nature of the defendants' interest being condemned. The Supreme Court then distinguished several old cases under the former statute where commissioners assessed the value of the land but had nothing to do with the division of the award between adverse claimants. It concludes as follows at pages 613-614 (124 Cal.) : '' [T]he rule of pleading in these cases requires the plaintiff to set out an accurate and intelligible description of the property, or the particular

interest in the property which, even in case of default must be valued before it is condemned. We are in entire accord with this doctrine, and we think the plaintiff here has fully satisfied its demands. It has given an accurate description of what it seeks to condemn, and ought to pay for, before it takes possession. It claims an interest in the property, or an easement which it says diminishes the estate and interest of defendants, and all this is set out in order that the court and jury may know precisely what is to be considered in estimating damages.''

The Supreme Court goes on to state that the defendants' motions to strike and to stay the proceedings were properly denied by the trial judge.

It is obvious that in *Pomeroy* the city was claiming the waters as its own and seeking to condemn ownership of the land less the water rights that it already owned. In the present case the state's claim is a little different. It claims to own the whole fee with respect to part of the property it wants to use, i.e., the bed of the stream in its original location. It is not claiming, or certainly has not established, that it has title to the rest of the disputed area. We think that *Pomeroy* still applies.

Applying guidelines of the *Pomeroy* decision to the facts before this court, we are forced to the conclusion that plaintiff state has neither pleaded nor presented these cases with the full disclosure of interests required by *Pomeroy*. It did not set forth the nature and extent of its own claim of ownership in the disputed area between the south boundary of the Rancho Fernandez and the river in its present location. It did not name all possible claimants as parties defendant. With the facilities at its disposal the state should have made an accurate survey of the entire area which it intended to occupy and should have named as parties defendant all possible claimants to the portions of the property not covered by the bed of the river in its original location, and it should have pleaded its ownership of the bed of the river and fixed its location both by pleading and proof.

It appears to us and we hold that the trial court correctly placed upon the defendants the burden of producing evidence to show that they held and occupied the area in dispute under color of title and that they paid all taxes levied or assessed against it by the County of Butte. On the assumption that the defendants satisfied this initial burden and established that

they held title back to 1901 of all the area south of the rancho south boundary and north of the present river (or at least that part north of the McCoy 1901 survey line) and had paid taxes and exercised dominion over it from time to time, the burden of going forward shifted to the plaintiff, and it became necessary for plaintiff to show the nature of its own title in the area and the physical limits of the part it claimed to own. The state assumed to do this by proving that the river in its original location, before California's admission to the Union, was navigable. It also showed that defendants did not acquire title to any area south of the confirmation patent meander line as successors in interest to the original patentees. But it completely failed to locate on the ground the extent of its own ownership, because, conceding the state's ownership of the bed of the river in its original location and that the north bank of the river may have been established, there was no evidence at all as to the location or position of the south bank of the river until after the channel had been drastically changed, probably in 1862, by unnatural causes. The only evidence of a south bank location was the so-called "Deyer's Survey 1867," some years after the original change in the course of the river.

■ The state prevailed upon the trial court to rule that the north bank of the river in its location at the time of the confirmation patent in 1857 had to be considered to be identical with the meander line as surveyed by Green. The court adopted the plaintiff state's contention as against the defendants' contention that there was a wide area between the surveyed meander line and the bank for which the state was required to pay. We agree that the trial court properly ruled that since the actual boundaries of the river had been obliterated by activities of man the only line available to establish the location of the north bank of the river was the meander line established by the Green survey. See *Anderson* v. *Trotter*, 213 Cal. 414, 420 [2 P.2d 373], which states the general rule that a meander line is not the boundary line but refers to an exception where the body of water does not exist. The trial court correctly held that the south boundary of the rancho was the surveyed meander line of the north bank of the stream. ■ But a river bed cannot be defined by locating only one bank of the river. Therefore, assuming that the river bed was the property of the state, the state cannot claim to be the owner of the whole area in dispute, because it has failed to

establish its ownership of any definite area at all in the area of dispute. The state, in effect, claimed that it owned the original river bed but was never able to fix its location. Just as defendants could not establish that there was an area between the surveyed meander line and the actual north bank of the now unlocated river, so the state was unable to establish the physical area occupied by the original river bed.

It is apparent, therefore, that the trial court properly identified the north bank of the river with the meander line as surveyed by Green in 1857 in connection with the confirmation patent, and that the south boundary of the lands included within the area covered by the confirmation patent were bounded on the south by that line. The trial court was not warranted, however, in assuming that the state was the owner of any property between that line and the north bank of the river in its new location because the state failed to delineate and locate the bed of the original river within that area.

How does the foregoing conclusion affect the claim of the defendants that they have acquired title to the intervening area by adverse possession? ▮▮▮ Before attempting to answer this question, it becomes necessary to determine whether the defendants were required to prove adverse possession in the usual sense or whether a showing of occupancy under section 1006 of the Civil Code was sufficient.

There is no question but that defendants in their pretrial statement requested that the title of the state to any of the disputed area be made an issue. The pretrial order signed by the trial judge sets forth the contentions of the state and the contentions of defendants but failed to mention any obligation on the part of the state to prove title to any area. Instead, it required the defendants to establish their title by adverse possession.

Assuming that the state failed to establish its own title, there was evidence that defendants were the owners of paramount title based upon color of title, payment of taxes and occupation of the premises. Was such a showing not sufficient to prove their right to be compensated for the loss of the property when the state entered under orders for possession? To put the matter another way, did the pretrial order requiring proof of title by adverse possession foreclose a showing of title by less than adverse possession, if, in fact, the law recognizes the lesser proof as being sufficient to establish all the title that was necessary even though it might be technically deficient as a showing of adverse possession?

We do not believe that a technical showing of adverse possession was required in this case even though the pretrial order provided for such a showing. Where the state failed to show its own title, then proof of title by defendants under section 1006 of the Civil Code would be sufficient as a basis for awarding compensation to defendants for the property.

Section 1006 of the Civil Code reads as follows: "Occupancy for any period confers a title sufficient against all except the state and those who have title by prescription, accession, transfer, will or succession; *provided, however,* that the title conferred by such occupancy shall not be a sufficient interest in property to enable the occupant or his privies to commence or maintain an action to quiet title under the provisions of section seven hundred thirty-eight of the Code of Civil Procedure of this state, unless such occupancy shall have ripened into title by prescription."

The only record title to the disputed area that was before the trial court in this case was the record title of defendants. Their record title to the disputed area, at least to the meander line of the center of the river as surveyed by McCoy, November 5, 1901, dates back to an amended decree of distribution in the estate of Jenkin Morgan, deceased, dated January 3, 1902, Superior Court of Butte County, State of California, which was duly recorded. The original decree of distribution in the Morgan estate was made on the 5th day of October 1901, and was likewise recorded. Since the amended decree refers to a "corrected description" and to the McCoy survey of November 5, 1901, it is safe to assume that the survey was made for the express purpose of establishing the extent of the title and area distributed to the distributees in the Jenkin Morgan estate. Before the ink on the original decree of distribution was dry the distributees of the Morgan estate apparently employed McCoy, the county surveyor, to survey the portion of lands between Thermalito and the center line of the Feather River. The property after the survey is set forth in the amended decree as "newly discovered" and contains a total of 101.89 acres instead of 94.38 acres as in the original decree.

Going back to title by "occupancy" as defined in section 1006 of the Civil Code, we find that defendants who trace their title back to the Morgan estate decree of 1901, or the amended decree of 1902, have not been confronted by any party, so far as the record to this action shows, who has title

"by prescription, accession, transfer, will or succession." In other words, if we disregard for the moment any possible title in the state, it would appear that the defendants have a title to the disputed property that is good against everyone but the mythical "true owner," who may not even exist. In attempting to prove "adverse" possession the defendants apparently established that whatever acts of dominion occurred over the disputed area were done by the defendants or their predecessors and privies even though a particular use, as for dredge mining in the 1940's, may not have continued continuously over a five-year period. There were various independent acts of dominion over the property, starting with the McCoy survey in November 1901, which showed a claim of ownership—such as dredging and mining the property and leasing for gravel removal; but the important thing under section 1006 of the Civil Code is that there was a complete absence of evidence that anyone not connected with the defendants' predecessors and their privies ever challenged their occupancy.

It seems to us that section 1006 of the Civil Code is but a codification of the common law rule set forth in the older California cases which hold that possession gives rise to a presumption of ownership that must prevail in the absence of any other evidence of title. (*Hutchinson* v. *Perley* (1854) 4 Cal. 33 [60 Am.Dec. 578]; *Sacramento Valley R.R. Co.* v. *Moffatt* (1857) 7 Cal. 577.)

A later case reasserting the same principle that the prior possessor is presumed to be the owner and that the type of possession necessary may vary with the circumstances is the case of *Hart* v. *Cox* (1915) 171 Cal. 364 [153 P. 391]; see also *Montecito Valley Water Co.* v. *Santa Barbara* (1904) 144 Cal. 578, 593 [77 P. 1113]; *Whittaker* v. *Otto* (1961) 188 Cal.App. 2d 619, 626 [10 Cal.Rptr. 689]; Craig, *Prescriptive Water Rights in California,* 42 Cal.L.Rev. 219, 220-223.

In the *Hart,* case, *supra,* neither party relied on color of title, and the acts of dominion over the property by the party claiming as a prior possessor were no more significant than in this case. It was held that the trial court properly instructed that prior actual possession of the plaintiff was sufficient evidence of title to prove ownership and to entitle plaintiff to recover in ejectment unless defendant could account for such possession or show prior possession or title in himself. The Supreme Court in *Hart* also approved an instruction to the jurors that as between two parties neither of whom connects himself with the title of the government, " 'the first actual

possessor is absolutely presumed to possess the legal title.' " (P. 369.)

The presumptions referred to in all of the foregoing cases are, of course, the same presumptions based upon possession that were in effect prior to the adoption of the Evidence Code, i.e., subdivisions 11 and 12 of section 1963 of the Code of Civil Procedure, which have been superseded by sections 637 and 638, respectively, of the Evidence Code. Before the repeal of the old section and the adoption of the Evidence Code rebuttable presumptions were, of course, evidence and not merely procedural devices to regulate the production of evidence. The "occupancy" cases are usually ejectment cases, but they all recognize the principle of title by occupancy. Also, the plaintiff obtained an order for "possession" at the start of these cases.

■■■ It would appear, therefore, that the trial court should have considered whether section 1006 of the Civil Code was applicable in this case unless the involvement of the "State" as a party makes it inapplicable.

■■■ As heretofore stated, the bed of the Feather River in its original location at the time of California's admission to the Union became the property of the state because at that time the river was a navigable stream by statute. (Stats. 1850, ch. 37, pp. 100-101; *Lux* v. *Haggin,* 69 Cal. 255, 335-336 [4 P. 919, 10 P. 674].)

But when the river shifted to a new location as a result of unnatural forces, the state did not acquire title to the bed of the stream in the new location, and the state does not claim the bed of the river in its present location. It is therefore unnecessary for us to decide whether the river is navigable in its present location.

The state did not lose title to the bed of the stream in the old location in the absence of some formal type of abandonment, but it has completely failed to show the limits and location of the old stream bed.

■■■ Had the state established the boundaries and physical location of the original stream bed, section 1006 of the Civil Code could not be relied upon by defendants to prove that they owned a compensable interest in the property, except outside the area of the original stream bed, because within that area, if established, the title of the state would have been involved and Civil Code section 1006 by its own terms would be inapplicable.

However, the trial court did not require the state to produce evidence of the location and extent of the original river bed. It simply assumed that the state owned the whole disputed area between the south boundary of the Fernandez Rancho and the river in its present location. This was error. The court went on to find that defendants had not established a title by adverse possession. This finding may have resulted, in part, from the assumption of ownership in the state. The court never arrived at or considered the question of whether defendants were entitled to rely on section 1006 of the Civil Code as to any part of the disputed area, or whether such occupancy and possession as defendants were able to prove in themselves and their predecessors were sufficient to show a compensable title in this condemnation proceeding under section 1006 of the Civil Code. We, therefore, have concluded that the judgment must be reversed and the cause remanded for a new trial on all issues. The state must establish the location and extent of the original river bed so as to prove its own title to that portion of the disputed area. As to the land as to which the state does not prove its own title, the defendants may show their own compensable interest by establishing (a) title by adverse possession or (b) title by occupancy under Civil Code section 1006. Defendants should then have a jury evaluation of the lands of which they are found to have a compensable title.

We have referred above to *Sacramento Valley R.R. Co.* v. *Moffatt,* 7 Cal. 577, which held that the defendants in possession of property were entitled to be compensated as owners of the land. It is suggested by counsel for plaintiff that the case cannot be regarded as authority for the proposition that a presumptive title from possession is compensable in eminent domain because there have been statutory changes and *City of Los Angeles* v. *Pomeroy, supra* (124 Cal. 597) holds otherwise. ■ We have carefully examined *Pomeroy* and have concluded that *Pomeroy* affects the *Moffatt* decision to the extent that it permits a determination of a title question between condemnor and condemnee which *Moffatt* forbade, but it has no effect upon that portion of the *Moffatt* case which holds that a possessory title, if established, is compensable in a condemnation proceeding.

The court in *Pomeroy* approved a determination of title as between condemnor and condemnee, provided the issue was laid in the pleadings and supported by proof at trial. It did not, however, even suggest that title as between various claim-

ants other than the condemnor should be tried by the court in advance of the valuation part of the trial. ▌ The case seems to us to recognize that if the plaintiff has no claim of title, it must pay the full value of the property into court where it can then be divided among the owners and claimants as their interests appear, even if they are described as "persons unknown" and served by publication. The parties to be named defendant are entirely within the control of the plaintiff. (Code Civ. Proc., §§ 1244, 1245.3 1246.1.) Mr. Nichols in his work on eminent domain confirms the views expressed herein. (2 Nichols, Eminent Domain (3d rev. ed.) § 5.2, p. 17 et seq. and § 5.2, p. 22 et seq.)

In support of its contention that defendants have not established sufficient ownership of the disputed area, the plaintiff relies upon *People* ex rel. *Dept. of Public Works* v. *Lundy* (1965) 238 Cal.App.2d 354 [47 Cal.Rptr. 694]. In that case a railroad right of way lay between the proposed freeway and the ranch lands of the defendant-owners. There were two crossings over the railroad right of way that connected defendants' land to the original highway which was being converted to the freeway. The defendant-owners claimed the land being taken should be valued as though they had two easements of access to the old highway. The state in its condemnation complaint described the two crossings as separate parcels and persuaded the court to hear in advance of valuation the question of whether defendants had easements or revocable licenses across the railroad. The trial court held they were easements and the appellate court held that they were not and recited in its opinion that a prerequisite to compensation is that a claimant must prove his ownership of an estate or interest in the land being condemned. It is not clear whether the railroad was a party to the proceeding, but it was admitted that there was no writing between the defendants and the railroad with reference to the crossing and that signs were in place granting defendants permission to cross. The court simply held as a matter of law that the defendants had only a license and not an easement. The case is not the same as the proceeding before us because other than the state's claim to the unlocated river bed there was no proof whatever in the present case that anybody has a better title than defendants, or that anyone even claims title in opposition to defendants' claims. In *Lundy* the identity of the owner of the property over which the easements were claimed

was known and the permissiveness of the defendants' use was established. Furthermore, there were so many other errors at the trial level that it is quite impossible to tell whether the Supreme Court's denial of a hearing was of any importance. There seems to us to be considerable merit in the view of Mr. Justice Stone expressed in his dissent, wherein he stated that the question of whether the right to cross over was a revocable license or an easement was not too important because it had been used for 50 years without interruption, and the jury should have been able to consider it on the valuation question. At any rate, we do not feel bound to regard the case as requiring us to reach a different conclusion than the one we have already expressed.

 We are not persuaded that defendants's failure to object to the pretrial order or otherwise to object to the findings of the court on the boundary issue should foreclose them as to their position on this appeal. They attempted to have the pretrial order reflect that the title of the plaintiff state to the disputed area was in issue. Their requests were rejected and they undertook to establish title by adverse possession when a lesser proof of title by occupancy may well have been sufficient except as to that property owned by the state.

We turn now to defendants' contentions with regard to alleged errors occurring in connection with the valuation phase. Since we have already determined that a new trial must be granted, the following points will be discussed briefly for the assistance of court and counsel on retrial.

 Defendants first contend that the trial court erred in fixing the valuation date as June 3, 1964, when the trial of the boundary dispute began, rather than June 7, 1965, when the trial before the jury commenced on the issue of compensation. Since the action was not brought to trial within one year from the date of its commencement and the defendant was not responsible for the delay, the date of trial was the correct date for valuation. (Code Civ. Proc., § 1249.) The trial of the boundary issue commenced on June 3, 1964, and that date was fixed by the court as the valuation date even though there were many further delays, some attributable to each side, before the final phase of the case on valuation was commenced on June 7, 1965. In condemnation cases it appears to be proper to make one set of findings and to enter one judgment though parts of the case may be for the court and the valuation for the jury. (Code Civ. Proc., § 1264.7; see also *People*

*ex rel. Dept. of Public Works* v. *Murata,* 55 Cal.2d 1 [9 Cal. Rptr. 601, 357 P.2d 833].) There was no error in fixing the valuation date on the date of the commencement of the first phase of the trial as there is really only one trial.

The defendants next contend that the trial court erred when it denied their motion to amend to include a prayer for severance damages to the remainder of one tract not wholly taken. The motion was not made until the morning of the valuation portion of the trial. The original pretrial order required that any amendment to show severance to any parcel should be filed before the commencement of the boundary phase of the trial. This was not complied with, and though there was an amendment of the pretrial order with respect to severance to one parcel, there was no attempt to plead the dollar amount of severance claimed to another parcel for a period of almost 6 months between the date of the court's decision on the boundary issue and the date of trial on the valuation phases. While it probably would not have taken the plaintiff by surprise if the court had permitted the amendment requested at the start of the valuation phase, we cannot say that it was an abuse of discretion to deny the motion to amend at such a late date. (*Benom* v. *Benom,* 173 Cal.App.2d 286, 295 [343 P.2d 632].)

In view of the remand of the case, the trial court will have further opportunity to pass on any matters that properly may be presented by way of motion, including an application to plead severance damages, if any.

The final contention of the defendants with reference to the valuation phase of the case relates to the court's action in striking certain testimony of the witness Richter. It is quite clear that at one point in his testimony the witness admitted that a demand for aggregate in the area influenced his opinion that parcel 1-A was worth a certain figure per acre. The witness also said that his opinion of the value per acre was partially based upon the fact that the project itself had caused a demand for aggregate from parcel 1-A. It was obviously not error to strike his valuation of the property so based in part on demand for aggregate for the project. (*County of Los Angeles* v. *Hoe,* 138 Cal.App.2d 74, 78 [291 P.2d 98]; *Sacramento, etc. Drainage Dist.* ex rel. *The State Reclamation Board* v. *Reed,* 215 Cal.App.2d 60, 64 [29 Cal. Rptr. 847]; *People* ex rel. *Dept. of Water Resources* v. *Brown* (1967) 255 Cal.App.2d 597 [63 Cal.Rptr. 363].)

For the reasons heretofore given, the appeals from the orders denying motions for new trial are dismissed. The judgments are, and each of them is, reversed with directions to retry the cases in accordance with the views expressed herein.

Pierce, P. J., and Friedman, J., concurred.

A petition for a rehearing was denied August 26, 1968, and respondent's petition for a hearing by the Supreme Court was denied September 25, 1968. Mosk, J., did not participate therein.